Filed 4/25/18; Certified for publication 5/15/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KERRIE REILLY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MARIN HOUSING AUTHORITY,<br><br>    Defendant and Respondent. | A149918<br><br>(Marin County<br>Super. Ct. No. CIV 1503896) |

Kerrie Reilly lives with her severely disabled adult daughter in housing subsidized by the Marin Housing Authority (MHA). The family participates in the Housing Choice Voucher program, commonly known as Section 8, which MHA administers according to the rules and regulations of the United States Department of Housing and Urban Development (HUD). As a Section 8 participant, Kerrie Reilly receives a monthly rent subsidy, or "housing assistance payment," the size of which varies depending on her income.

The Reillys also participate in a state social services program designed to help incapacitated persons avoid institutionalization. The In-Home Supportive Services (IHSS) program compensates those who provide care for aged, blind, or disabled individuals incapable of caring for themselves. (*Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 744 (*Norasingh*).) Reilly's daughter suffers from a severe developmental disability, such that she requires constant supervision, and IHSS pays Reilly for providing her daughter with care-giving services. The question this case presents is whether the money Reilly receives from IHSS is "income" within the meaning

1

of HUD regulations, such that MHA should include it in calculating the size of Reilly's housing assistance payment. We hold that it is, and affirm the trial court in sustaining MHA's demurrer on this basis.

## FACTUAL AND PROCEDURAL BACKGROUND

According to the verified petition that is the operative pleading in this case, Reilly and two daughters moved into a three-bedroom apartment in Novato in 1998 and began receiving Section 8 housing assistance payments. In 2004 one daughter moved out, but Reilly failed to inform MHA of her departure. Five years later, when Reilly told MHA that this daughter no longer lived with her, MHA informed Reilly that her failure to report the departure earlier was a violation of program rules and that she could stay in the apartment only if she paid damages to MHA in the amount of $16,011. Reilly and MHA memorialized a settlement that called for Reilly to make monthly payments, initially of $486, toward that sum. Because Reilly was unable to afford these payments, the parties revised the plan several times, eventually reducing Reilly's obligation to $150 per month. Still, Reilly missed multiple payments.

By letter dated April 7, 2015, Reilly requested that MHA recalculate her rent and exclude her income from IHSS. MHA did not respond to that request, but soon thereafter served Reilly with notice of a proposed termination of her Section 8 voucher. A hearing officer determined that this first proposed termination was defective, but on July 31, 2015, MHA issued a second termination notice, this time alleging that Reilly failed to make multiple payments under the repayment plan. At an informal hearing on August 25, 2015, Reilly argued that MHA had improperly included her IHSS payments as income and that, excluding these payments, there was no lawful basis for MHA to have demanded $16,000 from her.

On September 8, 2015, the hearing officer issued a short, written decision upholding MHA's decision to terminate Reilly's housing voucher. The hearing officer made the following factual findings: Reilly failed to promptly notify MHA when one daughter moved out of the subsidized apartment, then entered into a repayment agreement in 2009; Reilly breached that agreement in 2010, and at a hearing following

2

the breach was warned that any future failure to make payments would result in the termination of her housing assistance; Reilly breached the agreement again in 2012, and in 2014 and 2015 when she missed payments for 16 months.  The hearing officer concluded that Reilly's failure to pay the amounts required under the agreement was grounds for terminating assistance under a HUD regulation (see 24 C.F.R. § 982.552(c)), and under an MHA policy requiring termination after three missed payments in a 12-month period.  The hearing officer did not address the issue of whether IHSS payments were properly counted as income, observing only that Reilly did not dispute her non-payment of the debt but instead presented a case "based on factors not related to the actual cause of termination."

On October 26, 2015, Reilly filed in the Marin Superior Court a verified petition for writ of mandate and, on July 20, 2016, an amended verified petition (hereafter petition).  The petition alleges two related causes of action, both premised on the theory that counting IHSS payments as income violates the governing HUD regulation, 24 Code of Federal Regulations part 5.609(c)(16) (hereafter section 5.609(c)(16)).  Reilly's first cause of action seeks an administrative writ, specifically an order requiring MHA to terminate Reilly's repayment plan and reinstate her Section 8 voucher.  (See Code Civ. Proc., § 1094.5.)  The second cause of action seeks a writ of mandate directing MHA to terminate the repayment plan and exclude Reilly's IHSS payments in calculating income going forward.  (See Code Civ. Proc., § 1085.)  Both causes of action include a request for attorney's fees and costs, asserting the action will benefit the public.  (See Code Civ. Proc., § 1021.5.)

MHA demurred to the petition, and the trial court sustained the demurrer after a hearing on November 4, 2016.  The trial court concluded that Reilly's interpretation of section 5.609(c)(16) was "wrong as a matter of law."  The HUD regulation broadly defines income, subject to exceptions including an exception for payments from a state agency "to offset the cost of services and equipment needed to keep [a] developmentally disabled family member at home."  (§ 5.609(c)(16).)  The trial court concluded that this exception did not apply, reasoning that Reilly " 'has not incurred out-of-pocket expenses

3

that are being 'offset' by the IHSS payment.' " Instead, "[s]he is being paid for her services." Thus, Reilly's IHSS payments count as income. In reaching this conclusion, the trial court relied on a federal case involving the earnings of a Texas mother whose son was the beneficiary of a somewhat similar state program. (See *Anthony v. Poteet Housing Authority* (5th Cir. 2009) 306 Fed. Appx. 98 (*Anthony*).)

Given the trial court's reading of the HUD regulation, the court concluded that no amendment to Reilly's petition would cure the defect the court had identified, so it sustained the demurrer without leave to amend and dismissed Reilly's petition with prejudice. This appeal timely followed. While the case is pending this court ordered, as did the trial court before us, a stay in the enforcement of the administrative order terminating Reilly's Section 8 benefits.

## DISCUSSION

We review de novo the trial court's order sustaining MHA's demurrer. (*Williams v. Housing Authority of Los Angeles* (2004) 121 Cal.App.4th 708, 718; *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529.) "[G]iving the pleading the benefit of all facts properly alleged" or judicially noticed, "and all reasonable inferences drawn therefrom," we must determine "whether the pleading has stated a cause of action." (*Busse v. United PanAm Financial Corp.* (2014) 222 Cal.App.4th 1028, 1035; see also *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Even where a pleading fails to state a cause of action, for the trial court to sustain a demurrer without leave to amend is an abuse of discretion if a plaintiff shows "there is a reasonable possibility that the defect can be cured by amendment." (*Ibid.*)

### The IHSS Program

IHSS is a "state and federally funded program developed to permit persons with disabilities to live safely in their own homes." (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 610.) Counties administer the program, pursuant to the requirements of Welfare and Institutions Code section 12300 et seq. and regulations

4

promulgated by the California Department of Social Services. (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 933–934 (*Basden*).) The program pays for severely impaired Californians to receive up to 65 hours per week in supportive services, including domestic services, personal care services, protective supervision, and other specifically enumerated categories of service. (*Id*. at p. 934; Welf. & Inst. Code, § 12300, subd. (b).) "Protective supervision" is monitoring of the behavior of a mentally impaired or mentally ill recipient to safeguard him or her from injury or accident. (*Norasingh*, *supra*, 229 Cal.App.4th at p. 745.) It is " 'nonmedical oversight, akin to baby-sitting.' " (*Ibid*.)

Those who provide services to IHSS beneficiaries "work pursuant to various arrangements. Some are civil service employees of a county; some are employees of an entity that contracts with the county; some contract directly with the county or authorized entity; some are referred to the recipient by the authorized entity; and some contract directly with the recipient. ([Welf. & Inst. Code] §§ 12301.6, 12302, 12302.1, 12302.25.)" (*Basden*, *supra*, 181 Cal.App.4th at p. 940.) Sometimes, as in this case, a recipient's parent receives compensation for providing care through the IHSS program, although the law limits both the circumstances in which a parent can receive such compensation and the categories of service for which the parent can receive compensation. (*Id*. at pp. 934–935; Welf. & Inst. Code, § 12300, subd. (e).)[1]

---

[1] Welfare and Institutions Code section 12300, subdivision (e), provides: "Where supportive services are provided by a person having the legal duty pursuant to the Family Code to provide for the care of his or her child who is the recipient, the provider of supportive services shall receive remuneration for the services only when the provider leaves full-time employment or is prevented from obtaining full-time employment because no other suitable provider is available and where the inability of the provider to provide supportive services may result in inappropriate placement or inadequate care." Family Code section 3910, subd. (a) places on each parent "responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means."

5

### *The Language of the HUD Regulation*

The applicable HUD regulation defines income broadly, as "all amounts, monetary or not," that a Section 8 program participant receives or anticipates receiving, unless such amounts are specifically excluded.  (24 C.F.R. § 5.609(a).)  Income includes, for example, "compensation for personal services" and "[p]ayments in lieu of earnings, such as unemployment and disability compensation" (24 C.F.R. § 5.609(b)), except that income does not include any of the 16 categories expressly excluded in paragraph (c) of the regulation.  Most importantly for our purposes, income does not include "[a]mounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home."  (§ 5.609(c)(16).)

MHA does not dispute that, to the extent the IHSS program pays for Reilly's daughter to attend a day program for special needs individuals or to receive assistance from a care-giver other than her mother, the value of those benefits must be excluded when calculating the Reilly family's income.  According to MHA, such expenditures are precisely the sort of benefits that section 5.609(c)(16) is designed to cover— reimbursement for out-of-pocket expenses the Reillys incur for services necessary to having Reilly's daughter live at home. [2]  The dispute in this case is whether, to the extent IHSS pays Reilly, rather than a third party, to care for her daughter, those amounts are excludable under section 5.609(c)(16).  Reilly argues they are, on the grounds that the services she provides are necessary for her daughter to live at home, and the IHSS payments offset the costs of those services.  MHA argues that one must incur an expense

---

[2] With no citation to the record, MHA asserts that the Reillys receive IHSS payments to cover costs for attendant care and participation at a YMCA day program, in addition to payments to compensate Reilly for her care-giving services.  As these are not facts in the petition or of which the court has taken judicial notice, we ignore this information except to emphasize that nothing in our decision should be understood to include any such expenses in Reilly's income.

before it can be offset with a reimbursement payment, so the services Reilly provides cannot be characterized as offsetting the costs of the services her daughter needs.

We are aware of only one other case that has construed the language of section 5.609(c)(16), and it is the case on which the trial court relied. In *Anthony*, the Fifth Circuit considered the earnings of a tenant in public housing whose son was disabled by multiple sclerosis. (306 Fed. Appx. at p. 99.) The son received in-home care services from a for-profit company, which the State of Texas and the federal government reimbursed through Medicaid. (*Id*. at p. 100.) The for-profit company employed Anthony, the young man's mother, to care for her son (and other clients) and paid her approximately $13,156 annually. (*Ibid*.) Anthony paid federal income taxes on these earnings, but argued that under section 5.609(c)(16) the local housing authority should exclude them from her income when calculating her rent. (*Ibid*.)

In an unpublished decision, the Fifth Circuit disagreed. The court noted at the outset that "all state-funded in-home attendant-care services in Texas are provided by private intermediaries, and Texas does not provide any amounts directly to families . . . ." (*Anthony*, *supra*, 306 Fed. Appx. at p. 101.) Overlooking this obstacle, the court assumed section 5.609(c)(16) would reach such pass-through funds in an appropriate case. (*Ibid*.) Yet the court refused to exclude Anthony's earnings because it concluded "Anthony has incurred no costs which must be offset with state funds." Equating "costs" with "out-of-pocket expenses," the court concluded "[o]ne must incur costs before they can be offset." (*Id*. at pp. 101–102.) Because the court affirmed a judgment in favor of the local housing authority on the basis of what it called the plain language of section 5.609(c)(16), it declined to consider a letter from HUD that the housing authority proffered as the agency's construction of the regulation. (*Id*. at p. 101.)

MHA urges us to follow *Anthony* in construing section 5.609(c)(16). The plain meaning of "[a]mounts paid . . . to *offset the cost* of services . . ." is that a family must have incurred a cost, or expense, for services before that cost can be offset, or

7

reimbursed, by a state agency's payment, MHA argues. (24 C.F.R. § 5.609(c)(16) (italics added).) To construe the regulation otherwise is to ignore the phrase "to offset the cost of services . . . ," and with it the interpretive maxim that instructs us to construe a statute or regulation in a manner that gives meaning to every word or phrase if possible, says MHA. (See, e.g., *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387.)

Reilly argues that MHA's construction of section 5.609(c)(16) violates another interpretive maxim—that MHA reads into the regulation limitations that are not there, a practice courts should avoid if possible. (See *People v. Bautista* (2008) 163 Cal.App.4th 762, 777.) To "offset" means generally to counterbalance or compensate for something, not only to reimburse for out-of-pocket expenses previously incurred. (See *Steinmeyer v. Warner Cons. Corp.* (1974) 42 Cal.App.3d 515, 518 [citing dictionary].) Reilly argues that if HUD had intended the narrower concept, it would have used language like "reimburse" and "out-of-pocket," as it did in defining other exemptions from income. For example, another paragraph in the same regulation exempts "[a]mounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member." (24 C.F.R. § 5.609(c)(4); see also 24 C.F.R. § 5.609(c)(8)(iii) [exempting amounts "specifically for or in reimbursement of out-of-pocket expenses incurred" for certain publicly assisted programs].) Reilly also argues that in section 5.609(c)(16) the phrase "cost of services . . . to keep the developmentally disabled family member at home" should be read broadly to include costs that the State of California would incur in the absence of payments such as those to Reilly, as well as Reilly's " 'opportunity cost,' " meaning the income she could have been earning at another job had she not given up opportunities for outside employment in order to care for her daughter.

We agree with Reilly as to the interpretation of "offset." Section 5.609(c)(16)'s exemption from income appears to reach money paid to a family so that the family can go

out and hire services or purchase equipment necessary for the developmentally disabled family member. Such payments "offset the cost of services and equipment" that would otherwise fall on the family. But they are not reimbursement for out-of-pocket expenses if the family receives payment before, rather than after, incurring the expense. For this reason, Reilly is persuasive that MHA has too narrowly defined "offset," but this is a comparatively small point that does not mean we agree with Reilly's construction of the regulation.

Considering further the meaning of "offset," we uncover the first of two problems with Reilly's construction of the phrase "cost of services . . . ." If a payment is to "offset the cost of services," the payment must go to the same entity that incurs the cost of those services. Otherwise the payment does not counterbalance or compensate for the cost of services. Here, section 5.609(c)(16) addresses amounts paid "to a family . . . to offset the cost of services . . . ." This means that the costs these payments offset must be costs that the family itself incurs. We recognize that in caring for her daughter Reilly performs services that are of great value to the State of California, but we do not think that the meaning of "cost of services . . . to keep the developmentally disabled family member at home" can be stretched to reach cost savings to the state from the provision of these services. To the extent that Reilly construes "cost of services . . ." to include costs to the State of California, we reject her construction.

Reilly raises a closer question with her argument that the "cost of services . . ." includes the opportunity cost to Reilly of providing those services. IHSS payments to Reilly do counterbalance or compensate for her loss of income in staying home to care for her daughter. And under one definition of the word "cost," this loss of income is a cost to Reilly. "Cost" can mean a "loss or penalty incurred esp[ecially] in gaining something." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 262.) One speaks, for example, of the human cost of a military campaign. Here, the loss that Reilly suffers in order to care for her daughter is the lost opportunity to earn income outside the home.

9

Reilly plausibly argues that the IHSS payments offset this cost to Reilly of foregoing a job by compensating her for providing in-home care.

There is, however, another more common and concrete meaning of the word "cost," namely "the amount or equivalent paid or charged for something; price." (Merriam-Webster's Collegiate Dict., *supra,* at p. 262.)  If "cost" means "price," then the cost of services that Reilly provides her daughter is, to Reilly, zero.  And because Reilly's services are free to the family, the family incurs no "cost of services or equipment . . ." that the IHSS payments could be said to offset.

In choosing between these two plausible constructions of section 5.609(c)(16), we look more broadly to the language of the regulation of which paragraph (c)(16) is a part.  Reilly reminds us, words " 'that relate to the same subject matter " 'must be harmonized to the extent possible.' " ' " (*People v. Gonzales* (2008) 43 Cal.4th 1118, 1127.)  The word "cost" appears two other places in section 5.609, one of which is the regulation's exemption from income for medical expenses.  That exemption covers "[a]mounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member."  (24. C.F.R. § 5.609(c)(4) (§ 5.609(c)(4)).)  In this context, the word "cost" has to be understood in its most common and concrete sense, as referring to an amount charged or paid.  We reach that conclusion because "medical expenses" are specific amounts paid for medical products or services.  And the phrase "specifically for, or in reimbursement of" likewise suggests that a family anticipates incurring, or has already incurred, a medical expense.  Similarly in the other place that section 5.609 uses "cost," the word means an amount of money paid, as in "the actual cost of shelter and utilities" for a welfare recipient.  (24 C.F.R. § 5.609(b)(6)(B)(ii) (§ 5.609(b)(6)(B)(ii)).)  Because "cost" has this concrete and specific meaning in section 5.609(c)(4) and section 5.609(b)(6)(B)(ii), we presume it has the same meaning in section 5.609(c)(16).  Generally " 'words or phrases given a particular meaning in one part of a statute must be given the same meaning in other parts of the statute' " (*People v.*

*Valencia* (2017) 3 Cal.5th 347, 381), and "[t]he same rules of construction apply to administrative rules as to statutes" (*Exelon v. Local 15, Intern. Broth. of Elec.* (7th Cir. 2012) 676 F.3d 566, 570 (*Exelon*)).  Applying this canon to construe section 5.609(c)(16), the "cost of services and equipment needed to keep the developmentally disabled family member at home" must refer to amounts of money that the Reilly family pays, rather than lost opportunities or other non-financial penalties it incurs.

### *History, Policy, and Deference to Agency Interpretation*

The parties agree that where the language of a regulation lends itself to more than one plausible reading, we must consider other interpretive methods.  To the extent the language of section 5.609(c)(16) leaves room for ambiguity, we look to the history of the regulation's enactment and the reasonableness of the competing proposed constructions, and we defer to an agency's authoritative interpretation of its own regulations.  (See *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1396–1397; *Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76–77; *Exelon*, *supra*, 676 F.3d at p. 570; *Robinson v. District of Columbia Housing Authority* (D.D.C. 2009) 660 F.Supp.2d 6, 17.) The parties disagree on whether the language of the regulation is sufficiently ambiguous that the court must engage in this process.  We need not settle that dispute, since our analysis of these other issues, like our analysis of the language of the regulation, leads us to conclude that MHA's interpretation of section 5.609(c)(16) is correct.

Reilly cites several passages from the rulemaking record that we think are unhelpful in resolving the interpretive issue before us.  On April 5, 1995, HUD published as an interim rule the exact language defining an exclusion from income that later became section 5.609(c)(16).  (See 60 Fed. Reg. 17391–17393 (Apr. 5, 1995).)  The explanation for HUD's proposal was brief:  "This exclusion exempts amounts paid by a State agency to families that have developmentally disabled children or adult family members living at home.  States that provide families with homecare payments do so to offset the cost of services and equipment needed to keep a developmentally disabled family member at

11

home, rather than placing the family member in an institution. Since families that strive to avoid institutionalization should be encouraged, and not punished, the Department is adding this additional exclusion to income. The Department wishes to point out that today's interim rule does not define 'developmentally disabled' since whether a family member qualifies as developmentally disabled, and is therefore eligible for homecare assistance, is determined by each individual State." (60 Fed. Reg. 17389 (Apr. 5, 1995).) We view this explanation as too summary to be enlightening. It speaks in generalities, and does not address the specific issue of whether all amounts paid by a state agency to a family with a developmentally disabled person living at home are excluded, or only those amounts that offset the family's expenditures for necessary services and equipment.

Equally unhelpful is the only comment added to the federal register when the rule became final. In response to a suggestion that HUD clarify the terms "developmentally disabled children" and "adult family members," HUD declined. HUD explained that its rule defers to the definitions used by the State program providing payments, so that where a family receives payments the housing authority should consider the family eligible for the exclusion. (61 Fed. Reg. 54497 (Oct. 18, 1996).) This portion of the rule-making record also does not speak to the interpretive issue before us, as both parties agree that Reilly's daughter is a person whose disability makes the family eligible for the exclusion. The question is the scope of payments to the Reilly family that section 5.609(c)(16) excludes, specifically whether or not payments for services that Reilly provides her daughter are excludable as payments "to offset the cost" of necessary services. (§ 5.609(c)(16).)

The rule-making record having failed to answer the question before the court, we turn now to comparing the results of the two proposed constructions. If a regulation " 'is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed.' " (*Greening v. Johnson* (1997) 53 Cal.App.4th 1223, 1229; see also *Exelon*, *supra*, 676 F.3d at 570.)

12

If the court adopts MHA's construction of the regulation, then families with a developmentally disabled family member at home will be able to exclude IHSS payments from income only to the extent the payments go to provide services and equipment for which the family pays. For example, if the family pays an in-home service provider to care for a disabled child while an able parent works outside the home, IHSS payments to cover the cost of that homecare aide are not counted toward the family's income. Only the parent's outside income counts. If instead the parent takes on the job of providing the child's homecare, as occurred in this case, then the IHSS payments to compensate for parental care count toward income, but the parent has no outside income. Just as IHSS payments substitute in the family's budget for the money the parent would have earned outside the home, so, too, they substitute for those foregone wages in being counted as income.

We believe this result is a reasonable outcome. First, the regulation so construed treats comparably two families with a developmentally disabled family member: one family in which a third party cares for the disabled person, and the other in which a parent does. Presumably the HUD regulation, like the IHSS program, seeks to assist both families, and to assist them equally. A second reason we think the result is reasonable is that it achieves a measure of parity between a family with a developmentally disabled family member and a family with a member disabled by severe medical problems. Under MHA's proposed construction, a family's out-of-pocket costs to provide protective supervision for a developmentally disabled family member are exempted from income under section 5.609(c)(16), just as medical expenses for a medically fragile family member are exempted under section 5.609(c)(4). But IHSS payments that compensate a parent who provides care for her developmentally disabled child are not exempted, just as they would not be for a parent providing care for a physically disabled family member. In this respect, section 5.609(c)(16) as MHA construes it eliminates a disparity between

13

the families of those with a developmentally disabled family member and families with a member disabled by medical problems.

By contrast, Reilly's construction of the regulation gives people in Reilly's position a benefit that comparable families do not receive. Reilly would have her rent calculated as if she had no income from work at all, while another family with a disabled family member in which the parent works outside the home and pays a third party to provide homecare would have to pay rent calculated to include the parent's outside income. Also inequitable would be the result that, by virtue of her daughter's disabilities being developmental rather than physical, Reilly's construction would allow her to exclude IHSS payments for parental care-giving, which a parent receiving IHSS payments to care for a child disabled by medical problems could not do.

In sum, comparing the results of the competing constructions confirms our conclusion that MHA and the trial court correctly construe section 5.609(c)(16). We reach this conclusion without the benefit of the final interpretive tool the parties have urged upon us—deference to an agency's interpretation of its own regulation—because neither party points us toward an authoritative HUD interpretation of section 5.609(c)(16). MHA attempts to do so in its request for judicial notice filed on May 30, 2017, but we deny that request.

MHA requests this court take judicial notice of a short letter dated May 10, 2017, to MHA's general counsel from the Director, Office of Public Housing, U.S. Department of Housing and Urban Development, San Francisco Regional Office – Region IX. The letter attaches a 2007 letter from HUD's Office of General Counsel – Assisted Housing Division opining that the mother in *Anthony* could not exclude her wages from income under section 5.609(c)(16), representing that this decade-old opinion is "our current interpretation of 24 C.F.R. section 5.609(c)(16)." If the 2017 letter could be characterized as an official act of the executive branch, we could choose to take judicial notice of it (see Evid. Code, § 452, subd. (c); § 459, subd. (a)), but we decline to do so.

14

"Litigation-inspired opinions have no authority" where "the administrative agency is a party to the litigation." (*People ex rel. Lungren v. Cotter & Co.* (1997) 53 Cal.App.4th 1373, 1393.) On its face, the 2007 opinion is litigation-inspired, and like the *Anthony* court we construe section 5.609(c)(16) without reference to it. (See *Anthony*, *supra*, 306 Fed. Appx. at p. 101.)

Because we agree with the trial court and MHA on the meaning of section 5.609(c)(16), we find no error in the trial court's order sustaining MHA's demurrer to the petition. Reilly has shown no reasonable possibility that she could cure the defect if granted leave to amend, so we find no abuse of discretion in the trial court's decision to dismiss the petition with prejudice.

## DISPOSITION

The decision of the trial court is affirmed. In the interests of justice, each party shall bear its own costs on appeal.

15

_____

Tucher, J.[*]


We concur:


_____

Kline, P.J.


_____

Richman, J.


A149918, *Reilly v. Marin Housing Authority*

---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/15/18 after nonpublished opinion filed 4/25/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KERRIE REILLY,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>MARIN HOUSING AUTHORITY,<br><br>     Defendant and Respondent. | A149918<br><br>(Marin County<br>Super. Ct. No. CIV 1503896) |

BY THE COURT:

The opinion in the above-entitled matter filed on April 25, 2018, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

                                                                 Richman, Acting P.J.

1

Court:  Marin County Superior Court

Trial Judge:  Hon. Paul M. Haakenson


Attorneys for Appellant      Law Offices of Frank S. Moore
                 Frank S. Moore

Attorneys for Respondent      WFBM, LLP
                 Randall J. Lee
                 Anne C. Gritzer

A149918, *Reilly v. Marin Housing Authority*