# IN THE SUPREME COURT OF CALIFORNIA

KERRIE REILLY,

Plaintiff and Appellant,

v.

MARIN HOUSING AUTHORITY,

Defendant and Respondent.

S249593

First Appellate District, Division Two
A149918

Marin County Superior Court
CIV 1503896

August 31, 2020

Justice Chin authored the opinion of the Court, in which Justices Liu, Cuéllar, and Groban concurred.

Chief Justice Cantil-Sakauye filed a dissenting opinion, in which Justices Corrigan and Kruger concurred.

REILLY v. MARIN HOUSING AUTHORITY

S249593

Opinion of the Court by Chin, J.

The federal Housing Choice Voucher program is a key program in section 8 of the United States Housing Act of 1937. (42 U.S.C. § 1437 et seq., as amended by § 201(a) of the Housing and Community Development Act of 1974.) Commonly referred to as "Section 8," the program provides low-income families a monthly subsidy to pay for a portion of their rent. The amount of the subsidy depends, in part, on the income Section 8 families receive. The program, which is funded and regulated by the United States Department of Housing and Urban Development (HUD), is administered locally by public housing authorities (PHAs). In this case, we address whether a Section 8 beneficiary's compensation for providing in-home care for a severely disabled adult daughter should be excluded from income in calculating the rental subsidy. For reasons that follow, we conclude that it should be excluded and reverse the Court of Appeal's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1998, plaintiff Kerrie Reilly and her two daughters moved into a three-bedroom apartment in Novato and began receiving Section 8 housing assistance payments to subsidize their monthly rent. Reilly has an adult daughter, K.R., who is severely disabled and requires constant supervision. Reilly receives compensation to provide in-home supportive care for

1

K.R. through the state and federally funded In-Home Supportive Services (IHSS) program.

In 2004, Reilly's other daughter, R.R., moved out of their subsidized apartment, but Reilly did not inform the Marin Housing Authority (MHA), which is responsible for administering Reilly's Section 8 voucher. Five years later, when Reilly told MHA that R.R. no longer lived with her, MHA advised her that her failure to report her daughter's leaving constituted a violation of the program rules. Reilly could only stay in the government-subsidized apartment if she paid approximately $16,000 in damages to MHA.

Reilly agreed to pay MHA in monthly installments, initially starting at $486 and eventually lowered to $150 per month at Reilly's request. In 2010, after Reilly missed an installment payment, MHA warned her that future missed payments would result in termination of her housing assistance. Reilly missed multiple payments in 2012, 2014, and 2015.

In 2015, Reilly requested that MHA recalculate her rent and exclude her IHSS compensation from "income" under the relevant federal regulation. (See 24 C.F.R. § 5.609(c)(16) (2020).) MHA did not respond to this request, but instead served Reilly a notice of termination of her Section 8 voucher. After a hearing on MHA's decision to terminate Reilly's housing voucher, the hearing officer upheld the agency's decision, noting that Reilly's failure to pay amounts under the settlement agreement constituted grounds for terminating her housing assistance. The hearing officer did not address whether the IHSS compensation counted as income, however.

On October 26, 2015, Reilly filed a petition for writ of mandate seeking an order requiring MHA to terminate her

repayment plan and reinstitute her Section 8 voucher; she also sought an administrative writ ordering MHA to terminate the repayment plan and exclude Reilly's IHSS payments in calculating her income going forward. The trial court rejected Reilly's assertion that IHSS payments were excepted from the meaning of "annual income" (24 C.F.R. § 5.609(c)(16) (2020)). It sustained MHA's demurrer without leave to amend, and the CA affirmed the judgment. (*Reilly v. Marin Housing Authority* (2018) 23 Cal.App.5th 425.) Both lower courts ordered "a stay in the enforcement of the administrative order terminating Reilly's Section 8 benefits." MHA later agreed to an extension of this stay pending review in this court.

We granted review, limited to the issue whether IHSS payments should be excluded from "annual income" for purposes of calculating a Section 8 beneficiary's home assistance payment.

## DISCUSSION

### A. Overview of Section 8 voucher program

In 1974, Congress added the Section 8 housing program to the United States Housing Act of 1937 "[f]or the purpose of aiding low-income families in obtaining a decent place to live." (42 U.S.C. § 1437f(a); see generally Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2019) ¶ 12.) The program gives eligible families either "tenant-based" or "project-based" rent subsidies administered locally through PHAs. (See *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust* (9th Cir. 2011) 636 F.3d 1150, 1152–1153 [overview of Section 8 housing assistance].) " '[T]enant-based assistance' " is a rent subsidy that is tied to a specific family even if the family moves to other suitable housing. (42 U.S.C.

§ 1437f(f)(7).) " '[P]roject-based assistance,' " on the other hand, is tied to a specific housing development or unit. (42 U.S.C. § 1437f(f)(6).) We focus on tenant-based assistance, which is at issue in this case.

Under the tenant-based assistance program, at least 75% of all admitted families must be "[e]xtremely low[] income," i.e., their income may not exceed 30% of the median income calculated by HUD for the relevant area (24 C.F.R. § 5.603(b) (2020)); and all remaining admitted families must be "[l]ow income," i.e., their income may not exceed 50% of the median income. (*Ibid.*; *id.*, § 982.201(b)(1), (2)(i) (2020) [eligibility and targeting].)

After a Section 8 family selects an eligible rental unit approved by the applicable PHA, the PHA enters into a contract with the rental property owner. That owner "functions as a landlord in the private rental market. The owner signs a lease with the Section 8 tenant (which includes a HUD Lease/Tenancy Addendum) and also signs a Housing Assistance Payments (HAP) contract with the Housing Authority." (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2006) 136 Cal.App.4th 119, 123.) The PHA gives the subsidy payments directly to the property owner. (24 C.F.R. § 982.311(a) (2020).)

As we explain below (see *post*, at p. 8), the amount of the housing subsidy depends in large part on the "annual income" the Section 8 family receives or expects to receive. (See 24 C.F.R. § 5.609(a) (2020); *id.* § 982.201(a), (b) (2020).) The issue is whether the IHSS payments Reilly receives to provide services to keep her developmentally disabled daughter at home are excluded from income under 24 Code of Federal Regulations part 5.609(c)(16) (2020).

**B. IHSS**

IHSS is a state social welfare program implemented under The Burton-Moscone-Bagley Citizens' Income Security Act for Aged, Blind and Disabled Californians, enacted in 1973. (Welf. & Inst. Code,[1] § 12000 et seq., added by Stats. 1973, ch. 1216, § 37, p. 2904; see *County of Sacramento v. State of California* (1982) 134 Cal.App.3d 428, 430–431.) The purpose of the legislation is to give the aged, blind and disabled the "assistance and services which will encourage them to make greater efforts to achieve self-care and self-maintenance, whenever feasible, and to enlarge their opportunities for independence." (§ 12002.) IHSS is specifically "designed to avoid institutionalization of incapacitated persons." (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 931.) Providers perform nonmedical supportive services for IHSS recipients, such as domestic services, personal care services, protective supervision, and accompaniment to health-related appointments. (§ 12300; see *Miller v. Woods* (1983) 148 Cal.App.3d 862, 867, disapproved on other grounds by *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15.)

"IHSS is actually provided under three programs: the original IHSS program (the residual program) (§ 12300 et seq.); the Medi-Cal personal care services program (PCSP) (§ 14132.95); and the IHSS Plus waiver program (§ 14132.951).[2]

---

[1]   All further statutory references are to Welfare and Institutions Code unless otherwise noted.

[2]   Section 14132.951, subdivision (a) provides: "It is the intent of the Legislature that the State Department of Health Services seek approval of a Medicaid waiver under the federal

The latter two programs tap into federal funds, and IHSS recipients will receive services under the residual program only if they do not qualify under the other two programs. (§§ 12300, subd. (g); 14132.95, subd. (b); 14132.951, subd. (d).)" (*Basden v. Wagner*, *supra*, 181 Cal.App.4th at p. 933, fn. 4; see 2 Dayton et al., Advising the Elderly Client (2019) § 22:40 (Advising the Elderly Client); *Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 609–610.)

The State Department of Social Services (Department) administers the IHSS program in compliance with state and federal law. The Department promulgates regulations to implement the relevant statutes, which are set out in its Manual of Policies and Procedures: Social Services Standards (July 2019) (MPP). (MPP, §§ 30-700 to 30-785; see *Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 744–745.) County welfare departments administer the IHSS program with the Department's supervision, and determine an applicant's individual needs to authorize necessary services. (*Norasingh v. Lightbourne,* at pp. 744–745; see MPP, § 30-761 [needs assessment standards].)

A county welfare department may either obtain and pay directly a provider of the supportive services, or pay the recipient who hires one. (*Basden v. Wagner*, *supra*, 181 Cal.App.4th at p. 940 [when state pays provider or recipient directly, it assumes certain " 'employer' duties"]; MPP, § 30-

Social Security Act in order that the services available under Article 7 (commencing with Section 12300) of Chapter 3, known as the In-Home Supportive Services program, may be provided as a Medi-Cal benefit under this chapter to the extent federal financial participation is available. The waiver shall be known as the 'IHSS Plus waiver.' "

763.44.) Or, as in this case, it may compensate the parent who provides in-home care to her disabled child. (See § 12300, subd. (e); MPP, § 30-763.45 et seq.; see also Fam. Code, § 3910, subd. (a) [parent's responsibility extends to a "child of whatever age who is incapacitated from earning a living and without sufficient means"].) It bears noting that "[t]he vast majority of home care is provided by family and friends." (Advising the Elderly Client, *supra*, § 22:17.)

Reilly's daughter suffers from a severe developmental disorder and obtained authorization for protective supervision, i.e., 24-hours-a-day supervision that allows her to remain at home safely. (§ 12301.21; MPP, § 30-757.173.) Protective supervision involves "observing recipient behavior and intervening as appropriate in order to safeguard the recipient against injury, hazard, or accident." (MPP, § 30-757.17; see *Marshall v. McMahon* (1993) 17 Cal.App.4th 1841, 1847 [" 'Protective supervision' appears to be similar to care given small children, that is, anticipating everyday hazards and intervening to avert harm"].) Such supervision is available for "nonself-directing, confused, mentally impaired, or mentally ill persons only." (MPP, § 30.757.171; see *Marshall v. McMahon*, at p. 1847; *Calderon v. Anderson*, *supra*, 45 Cal.App.4th at p. 616.) There is no dispute that Reilly's adult daughter was entitled to IHSS services, or that Reilly was authorized to receive IHSS compensation for providing those services to her.

## C. HUD regulation on "Annual Income" and its exclusions

The applicable federal regulation defines "annual income" broadly, as "all amounts, monetary or not." (24 C.F.R. § 5.609(a) (2020).) For example, income includes "compensation for personal services" (*id.*, § 5.609(b)(1) (2020)) and "[p]ayments in

lieu of earnings, such as unemployment and disability compensation, worker's compensation, and severance pay" (*id.*, § 5.609(b)(5) (2020)). However, income does not include such amounts as "specifically excluded" under the regulation. (*Id.*, § 5.609(a)(3) (2020).) There are 16 such exclusions. (*Id.*, § 5.609(c)(1)–(17) (2020).)

"An extensive set of statutory provisions and regulations governs the calculations of the subsidy that must be paid on behalf of each tenant." (*Nozzi v. Housing Authority of City of Los Angeles* (9th Cir. 2015) 806 F.3d 1178, 1184.) In general, Section 8 tenants must contribute 30% of their monthly adjusted income or 10% of their gross monthly income, whichever is greater, towards each month's rent. (42 U.S.C. § 1437f(*o*)(2)(A).) The housing assistance payment covers the balance of the rent, up to a statutorily capped amount. (*Nozzi v. Housing Authority of City of Los Angeles*, at pp. 1184–1185.)

We do not examine the underlying method used to calculate the rental subsidy, however, but focus on whether Reilly's IHSS compensation for care of her disabled daughter is "specifically excluded" (24 C.F.R. § 5.609(a)(3) (2020)) from income as "[a]mounts paid by a State agency to a family with a member who has a developmental disability and is living at home *to offset the cost of services* and equipment needed to keep the developmentally disabled family member at home" (*id.*, § 5.609(c)(16) (2020), italics added). The parties do not dispute that if Reilly's daughter received IHSS care from a *third party* rather than a family member, such amounts paid would qualify under the exclusion. MHA argues that for the exclusion to apply, however, a family must incur costs for hiring someone because only then would the "[a]mounts paid" by the state to a family truly "offset" those "cost[s]." (24 C.F.R. § 5.609(c)(16)

(2020); see *In re Ali* (Minn. 2020) 938 N.W.2d 835, 840 (*Ali*) ["Cost means an actual monetary expense . . . incurred by the family to keep the disabled family member living at home"].) Because the state pays Reilly to provide care for her own daughter and not to hire a third party provider, MHA maintains there is no actual "cost" to Reilly for such services, and consequently, there is nothing to "offset."

### 1. *Meaning of "Offset" & "Cost"*

MHA's interpretation is based in part on the dictionary definition of "offset," which generally means to counterbalance or compensate for something. (See *Steinmeyer v. Warner Cons. Corp.* (1974) 42 Cal.App.3d 515, 518.) Echoing the Court of Appeal, MHA asserts that payments by the state must offset costs the family itself incurs to keep a developmentally disabled member at home; "[o]therwise the payment does not counterbalance or compensate for the costs of services." As MHA puts it, "the payment must go to the same entity that incurs the cost of those services." MHA further insists that "cost" is a monetary term that does not encompass *emotional* costs Reilly bears in caring for her daughter, nor any *lost opportunity* costs when Reilly forgoes outside employment to be her daughter's IHSS provider.

We disagree with MHA's interpretation. Unlike the word "reimburse," which means to "*pay back* or compensate (another party) for *money spent* or losses incurred" (American Heritage Dict. (5th ed. 2020) p. 1214, italics added), "offset" is not similarly restrictive. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 ["Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a

different meaning"].) For example, the term "reimbursement" is used in two other exclusions. (24 C.F.R. § 5.609(c)(4), (8)(iii) (2020).) Consistent with the meaning of "reimburse," those exclusions refer to compensation of specific, discrete amounts, e.g., "the cost of medical expenses" (*id.*, § 5.609(c)(4) (2020)) and "out-of-pocket expenses" to participate in a publicly assisted program (*id.*, § 5.609(c)(8)(iii)).

While the term "reimburse" suggests there may be full recompense for any out-of-pocket expenses a family incurs under those exclusions, "offset" as used here does not necessarily reflect that same meaning. (See *Briggs v. Eden Council for Hope & Opportunity*, *supra*, 19 Cal.4th at p. 1117.) Here, what is "offset" is the "cost of services and equipment needed to keep the developmentally disabled family member at home." (24 C.F.R. § 5.609(c)(16) (2020).) "[C]ost," in turn, is defined to include both "an amount paid or required in payment for a purchase; a price" and "the expenditure of something, such as time or labor, necessary for the attainment of a goal." (American Heritage Dict., *supra*, at p. 454.) Whether a family uses homecare payments to support itself so that it may care for a developmentally disabled member at home, or instead uses the funds to pay a third party to provide care for some of the time, these payments do no more than "offset" the "cost" of services and equipment needed to avoid institutionalization, costs that are not otherwise specified or limited. (24 C.F.R. § 5.609(c)(16) (2020).)

Further, contrary to MHA's suggestion, "cost" in this exclusion (24 C.F.R. § 5.609(c)(16) (2020)) does not have the same meaning as "cost" used in other provisions of the regulation. For instance, "actual cost of shelter and utilities" (24 C.F.R. § 5.609(b)(6)(ii) (2020)) and "cost of medical expenses for

any family member" (*id.*, § 5.609(c)(4) (2020)) both refer to discrete, monetary amounts. "[T]he presumption that 'identical words used in different parts of the same act are intended to have the same meaning . . . readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.' " (*Roberts v. Sea-Land Services, Inc.* (2012) 566 U.S. 93, 108.)

### 2. *Rulemaking history of 24 Code of Federal Regulations par 5.609(c)(16) (2020)*

This interpretation of the terms "offset" and "cost" is also consistent with the rulemaking history of 24 Code of Federal Regulations part 5.609(c)(16) (2020). (See 60 Fed.Reg. 17388–17395 (Apr. 5, 1995) ["Combined Income and Rent"; interim rule as precursor to 24 C.F.R. § 5.609(c)(16) (2020)]; 61 Fed.Reg. 54492–54504 (Oct. 18, 1996) [final rule]). Though the Court of Appeal found this history to be unhelpful and not illuminating, we do not share that view. (See *Thomas Jefferson Univ. v. Shalala* (1994) 512 U.S. 504, 512 [relevance of agency's " 'intent at the time of the regulation's promulgation' "].)

In 1995, HUD published an interim rule proposing eight new income exclusions — among them the homecare payments exclusion — to the definition of annual income under Section 8 and other assisted housing programs. (See 60 Fed.Reg. 17388–17395 (Apr. 5, 1995); 24 C.F.R. § 5.609(c) (2020).) It determined that the new exclusions "are essential for achieving its goals of ensuring economic opportunity, empowering the poor and expanding affordable housing opportunities. Moreover, HUD believes that the *costs* of additional exclusions will be *offset* by long-term future savings because the exclusions will increase

the number of economically self-sufficient families residing in assisted housing." (60 Fed.Reg. 17388, italics added.)

Regarding the "homecare payments" exclusion in particular, HUD explained that the "exclusion exempts amounts paid by a State agency to families that have developmentally disabled children or adult family members living at home. *States that provide families with homecare payments do so to offset the cost of services and equipment needed to keep a developmentally disabled family member at home, rather than placing the family member in an institution.* Since families that strive to avoid institutionalization should be encouraged, and not punished, the Department is adding this additional exclusion to income. The Department wishes to point out that today's interim rule does not define 'developmentally disabled' since *whether a family member qualifies as developmentally disabled, and is therefore eligible for homecare assistance, is determined by each individual State.*" (60 Fed.Reg. 17388, 17389 (Apr. 5, 1995), italics added.)

In finalizing the rule and responding to public comment that " 'developmentally disabled children' " and " 'adult family members' " should be expressly defined, HUD rejected the suggestion as unnecessary: "There is no need for HUD to define these terms, as they are defined by the State program providing the payments. *If the family is receiving such a payment from the State because a family meets the criteria of the definition, the [public housing authority] should consider the family eligible for the exclusion.*" (61 Fed.Reg. 54492, 54497 (Oct. 18, 1996), italics added.)

We find several points from this rulemaking history to be significant. As to the meaning of "offset," HUD recognized that

states that make payments for in-home services "do so to offset the cost" to the family keeping the developmentally disabled member at home "rather than placing the family member in an institution." (60 Fed.Reg. 17388, 17389 (Apr. 5, 1995).) Significantly, HUD here did not use "cost" and "offset" in terms of a specific monetary expense or amount a Section 8 family incurs, but in a broad sense with respect to describing the overall objective of the exclusion. HUD regarded homecare payments as reducing or offsetting costs to families caring for developmentally disabled individuals, costs that would be borne by state and federal governments if the family member were institutionalized. (See Perkins & Boyle, *Addressing Long Waits for Home and Community-Based Care Through Medicaid and the ADA* (2001) 45 St. Louis U. L.J. 117, 119 ["Most states have reduced costly institutional care by shifting some public funding to home and community settings"].)

This background clearly informs the interpretation of 24 Code of Federal Regulations part 5.609(c)(16) (2020). The language of the regulation ("amounts paid by a State agency . . . *to offset the costs of services and equipment needed to keep the developmentally disabled family member at home*" [italics added]) closely tracks this rulemaking language ("States that provide families with homecare payments do so *to offset the costs of services and equipment needed to keep a developmentally disabled family member at home*, rather than placing the family member in an institution") (60 Fed.Reg. 17388, 17389, italics added), and the italicized phrases at issue here are identical.

The only express limitation HUD has placed on this exclusion is that the in-home care payments must be for services and equipment needed to keep the "developmentally disabled" family member at home. (See *post*, at pp. 15–16.) Even then,

13

HUD found "no need" to define what "developmentally disabled" meant, and instead left this up to the states to decide. (61 Fed.Reg. 54492, 54497 (Oct. 18, 1996; see 60 Fed.Reg. 17389 (Apr. 5, 1995) ["whether a family member qualifies as developmentally disabled, and is therefore eligible for homecare assistance, is determined by each individual State"].) From HUD's perspective, "If the family is receiving such a payment from the State because a family member meets the criteria of the definition, the [public housing authority] *should consider the family eligible for the exclusion.*" (61 Fed.Reg. 54492, 54497, italics added.)

Notwithstanding the general rule that exclusions from income should be construed narrowly (see *Commissioner v. Schleier* (1995) 515 U.S. 323, 328), we find no indication that HUD intended a narrow construction of the homecare payments exclusion. We perceive no reasoned basis — including any basis informed by the regulation's language — why HUD would single out a parent provider's compensation as unworthy for income exclusion. Rather, we find HUD's stated goals of encouraging families to avoid the institutionalization of developmentally disabled individuals through the addition of this exclusion (60 Fed.Reg. 17388, 17389 (April 5, 1995)), and more globally of "ensuring economic opportunity, empowering the poor and expanding affordable housing opportunities" (60 Fed.Reg. 17388), would be furthered by permitting *all* homecare payments for services to keep developmentally disabled family members at home — whether the provider is a family member or third party — to be excluded from the meaning of "annual income." (24 C.F.R. § 5.609(c)(16) (2020).) By allowing these families to realize the full benefit of the homecare payments without facing a corresponding increase in rent, the exclusion

would operate as intended by not penalizing families who take on the onus of caring for a developmentally disabled family member at home.

To that end, it is helpful to remember that "[t]he United States Housing Act is a program of 'cooperative federalism.'" (*James v. New York City Housing Authority* (S.D.N.Y. 1985) 622 F.Supp. 1356, 1359; see 42 U.S.C. § 1437; see also *Hodel v. Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 289.) "HUD's delegation of eligibility requirements to local public housing authorities is intended to effectuate the underlying policy of the United States Housing Act by promoting efficient management of the programs . . . ." (*James v. New York City Housing Authority*, at pp. 1361–1362.) With respect to the exclusion for homecare payments specifically (24 C.F.R. § 5.609(c)(16)) (2020)), HUD expressly left it to the states to define "developmentally disabled," which in part determines a family's eligibility for the income exclusion. (See *ante*, at p. 12.)

Along these lines, HUD did not limit the income exclusion based on whether a state allows a family to use a family member or a third party to provide the necessary care; the exclusion covers "[a]mounts paid by a State agency to a family" with a developmentally disabled member (24 C.F.R. § 5.609(c)(16) (2020)). Indeed, acknowledging such a distinction would do little to advance the complementary purposes of the federal and state statutes. Congress established Section 8 with "the purpose of aiding low-income families in obtaining a decent place to live." (42 U.S.C § 1437f(a).) And our Legislature created IHSS with the goal of providing "supportive services . . . to aged, blind, or disabled persons . . . who are unable to perform the services themselves and who cannot safely remain in their

homes or abodes of their own choosing unless these services are provided." (§ 12300, subd. (a).) Like the purpose of the federal exclusion (see *ante*, at pp. 12–13), the IHSS program's purpose is to enable " 'disabled poor persons to avoid institutionalization by *remaining in their homes* with proper supportive services.' " (*Basden v. Wagner, supra*, 181 Cal.App.4th at p. 939.) Nevertheless, MHA would have us read in the words "from third parties" after the phrase "cost of services" (24 C.F.R. § 5.609(c)(16) (2020)) thereby making it correspondingly harder for certain families to provide necessary in-home care. Given this cooperative federalism regime, we ought to be reticent to interpret the HUD regulation in a way that would foreclose or hinder the objectives of the state IHSS program.

The dissent overstates the import of the authority it cites (see dis. opn., *post*, at pp. 1–2, 16–19). (See *Anthony v. Poteet Housing Authority* (5th Cir. 2009) 306 Fed. Appx. 98, 101 (*Anthony*) ["One must incur costs before they can be offset"]; *Ali, supra*, 931 N.W.2d 835.) In *Anthony*, an unpublished Fifth Circuit decision that first addressed the issue, plaintiff Brenda Anthony provided in-home care for her severely disabled son in their Section 8 subsidized apartment. Unlike California, the State of Texas does not pay families directly for in-home care; such care is provided by third party intermediaries, who in turn employ in-home attendants and pay them wages partially funded by the state. Through her employment as a personal care attendant with two private for-profit companies, Anthony provided care not only for her son but also for other clients under the terms of her employment.

In determining Anthony's annual income for purposes of calculating her subsidized rent, the PHA refused to exclude Anthony's wages under 24 Code of Federal Regulations part

5.609(c)(16) (2020)).  The Fifth Circuit agreed with the PHA's decision:  "[T]he fact that Anthony's employment income coincides with state funds that are set aside for her son's care does not make that income a form of reimbursement." (*Anthony*, *supra*, 306 Fed. Appx. at pp. 101–102.)  The court further rejected Anthony's claim that the services she provided her son were at a cost and were not free:  "[F]or Anthony, they are free.  She has no out-of-pocket expenses — 'costs' — that must be reimbursed or 'offset' by the state." (*Id*. at p. 102.)

We are not persuaded by *Anthony*'s reasoning on several grounds.  Fundamentally, Texas's program is distinct from the IHSS scheme in that "all state-funded in-home attendant-care services in Texas are provided by private intermediaries, and Texas does not provide any amounts directly to families to offset costs incurred to keep a disabled family member at home." (*Anthony*, *supra*, 306 Fed. Appx. at p. 101.)  Next, although Anthony's private employers paid her to provide in-home care to her son "with money partially provided by the state" (*id*. at p. 101), it is unclear what portion of her wages truly constituted "pass-through" state funds.  Her employers paid Anthony not just to care for her disabled son, but also to care for other clients.  (*Id*. at p. 100.)  Thus, Anthony's compensation as an in-home attendant was arguably indistinguishable from wages a parent earns from outside employment, and therefore properly not excluded from income under 24 Code of Federal Regulations part 5.609(c)(16) (2020)).  Finally, we do not agree with the Fifth Circuit's narrow interpretation of the exclusion as limited to out-of-pocket expenses that a state directly reimburses.  (See *Anthony*, *supra*, 306 Fed. Appx. at pp. 101–102; see *ante*, at pp. 9–11.)

Nor are we persuaded by the Minnesota Supreme Court's recent decision in *Ali*, *supra*, 938 N.W.2d 835, which relied in part on both *Anthony* and the Court of Appeal opinion below to reach a similar conclusion. (See *Reilly v. Marin Housing Authority*, *supra*, 23 Cal.App.5th 425.) Under Minnesota's Consumer Directed Community Support option for home and community-based services, a family receives a budget for specific services and equipment needed to keep a developmentally disabled member at home. (*Ali*, *supra*, 938 N.W.2d at p. 837.) The plaintiff, whose autistic son was eligible for the program, "chose to allocate a portion of the budget to herself as a paid parent to provide to her son some of the necessary services." (*Ibid.*) Following *Anthony* and *Reilly*, the *Ali* court adopted a narrow view of "cost" to mean out-of-pocket expenses, and concluded that the mother incurred no actual monetary expenses to "offset." (*Id.* at p. 840.)

As with the Texas program, the Minnesota program — which allowed the mother to "allocate her budget as she saw fit to keep her son living at home" — is structured differently from the IHSS program in a way that makes *Ali* distinguishable. (*Ali*, *supra*, 938 N.W.2d at p. 837.) Moreover, as with *Anthony*, we disagree with the *Ali* court's narrow interpretation of "cost" and "offset."

### D. MHA's policy arguments

Notwithstanding this reading of the HUD regulation, MHA asserts that including a parent's IHSS compensation as income is necessary to achieve a measure of parity between families in similar circumstances. An expansive reading of the exclusion (24 C.F.R. § 5.609(c)(16) (2020)), MHA argues, would unfairly advantage families who provide in-home care to a

developmentally disabled member because their compensation is not counted as income for purposes of calculating their rent subsidy, whereas no comparable income exclusion is available for a family with a medically disabled member or for a family who hires a third party provider.

In advancing this argument, MHA asserts the state pays Reilly "wages" under the IHSS program. Describing an employment relationship between Reilly and the State of California, MHA relies in part on the Court of Appeal's reasoning that "IHSS payments substitute in the family's budget for the money the parent would have earned outside the home." Such wages, MHA continues, should be considered part of her annual income just like the outside income of a parent who instead hires an in-home provider. We address these points in turn.

### 1. *Disparity based on individuals' different disabilities*

First, we reject MHA's and the dissent's assertion that excluding Reilly's IHSS payments from annual income under 24 Code of Federal Regulations part 5.609(c)(16) (2020) would create an unfair disparity by extending the exclusion to families with a *developmentally* disabled member but not to families with a *medically* disabled member. To the extent there is any disparity, it is inherent in the federal regulation itself, which specifically limits the exclusion to payments made to families caring for a "developmentally disabled family member." (24 C.F.R. § 5.609(c)(16) (2020).) Put another way, even assuming MHA's position is correct that the exclusion is limited to payments made to third party providers, it would still treat developmental disabilities more favorably than physical disabilities because whatever its scope, the exclusion by its

terms applies only to "[a]mounts paid by a State agency to a *family with a member who has a developmental disability*." (*Ibid.*, italics added.)

The regulation, moreover, does not require that an individual meet a particular definition of "developmentally disabled" for the income exclusion to apply. As previously discussed (see *ante*, at p. 15), HUD has not defined "developmental disability" in the regulation, but instead left it up to states to determine its meaning. Specifically, if a state program authorizes a family to receive in-home care for a family member, in HUD's view that family member "meets the criteria of the definition" of developmentally disabled, and the PHA "should consider the family eligible for the exclusion." (61 Fed.Reg. 54492, 54497 (Oct. 18, 1996), italics added.) This expansive view in favor of applying the exclusion is consistent with HUD's expressed concern that families of developmentally disabled members in particular would receive unfair treatment if this income exclusion were *not* made available to them. HUD added the relevant exclusion for families with a developmentally disabled member "[s]ince families that strive to avoid institutionalization should be *encouraged, and not punished*." (60 Fed.Reg. 17388, 17389 (Apr. 5, 1995), italics added.)

The dissent, however, asserts that precluding Reilly from utilizing this income exclusion would not amount to punishment because no other group, besides foster parents, enjoys the benefit of the income exclusion. (See dis. opn., *post*, at p. 34, fn. 18.) This critically misapprehends the nature of the penalty involved. The punishment here is not merely withholding a benefit to a family that is not otherwise given to similarly situated families; in other words, the dilemma a family faces is not choosing between enjoying or forgoing a "preferential

benefit," as the dissent seems to suggest. (Dis. opn., *post*, at p. 23.) Rather, if a family cannot utilize the income exclusion to exclude compensation for a parent's in-home care, this may cause the family to lose its Section 8 housing altogether because it is unable to pay an increased portion of rent. Without such housing, a family may face having to institutionalize a developmentally disabled member, a result the exclusion seeks to prevent in the first place.

Further, despite no expressed preference for family providers per se, "[r]ecipients needing 24-hour protective supervision — and other services — are more likely to receive better *continuous care* from relatives living with them whose care is more than contractual." (*Miller v. Woods*, *supra*, 148 Cal.App.3d at p. 870.) This continuity of care is particularly salient here because of the nature of need-based tasks under the IHSS program. Because an IHSS recipient may only receive specific services based on an assessed need — i.e., where "[p]erformance of the service by the recipient would constitute such a threat to his/her health/safety that he/she would be unable to remain in his/her own home" (MPP, § 30.761.14) — not all time that a provider spends with a recipient would be compensable. (See § 12300, subd. (a); MPP, § 30.761.12.) Many tasks are discrete and not clustered together throughout the day (such as feeding, dressing, bowel and bladder care), and a provider may not be compensated for time spent waiting in between those tasks. It would no doubt prove challenging to find many providers — other than family members — willing to work that intermittently during the day.

Family members may also make particularly good providers because IHSS services "involve a most intimate and personal aspect of an individual's life" and family providers

often "insure the least intrusion upon the recipient's privacy." (*Miller v. Woods*, *supra*, 148 Cal.App.3d at p. 878; see § 12304.1 ["preference shall be given to any qualified individual provider who is chosen by any recipient"].) Also recognizing that family-provided care is often the best type of care for individuals with disabilities, Congress has included it as one of the "goals of the Nation" to provide families of children with disabilities the services necessary to "enable families of children with disabilities to nurture and enjoy their children at home"; and "support family caregivers of adults with disabilities." (42 U.S.C. § 15091(a)(6)(B), (D) [congressional findings of Families of Children with Disabilities Support Act of 2000]; *id.*, § 15091(a)(1) ["It is in the best interest of our Nation to preserve, strengthen, and maintain the family"].) Congress further emphasized the important cost savings when family members are themselves providers for their disabled children: "Families of children with disabilities provide support, care, and training to their children that can save States millions of dollars. Without the efforts of family caregivers, many persons with disabilities would receive care through State-supported out-of-home placements." (*Id.*, § 15091(a)(2); see 60 Fed.Reg. 17388, 17389 (Apr. 5, 1995).) These expressed goals fully align with HUD's objective to have developmentally disabled individuals avoid institutionalization and instead live with their families at home.[3]

---

[3] Contrary to the dissent's suggestion, nothing in our opinion should be construed as implying that third party caregivers as a whole will provide "substandard" care compared to family members. (Dis. opn., *post*, at p. 31.) We merely confirm what Congress has expressly recognized about the benefits of having family caregivers.

This leads us to the inescapable conclusion that parents who keep their disabled child at home instead of in an institution — while also providing care as their child's IHSS provider — *are* different from other caregivers. That difference, however, cuts *in favor* of allowing a parent's IHSS compensation under the exclusion. Unlike third party caregivers whose job it is to take care of someone on an hourly basis, for these parent providers, caring for their child "is not a day job; it is their life." (*In re Hite* (Bankr. W.D.Va. 2016) 557 B.R. 451, 458 [holding parents' in-home care payments excluded from monthly income and consequently not deemed disposable income subject to creditors].) If in-home care payments are not excluded from her income, the benefits Reilly receives — the in-home care for her disabled daughter K.R. and the Section 8 housing assistance — would be at cross-purposes. A family should not be forced to make an impossible choice between these two critical benefits. We perceive no plausible reason why Reilly should not realize the full benefit of what each program has to offer her family.[4]

### 2. *IHSS payments as wages*

Next, we reject MHA's underlying assumption that a parent provider's compensation under the IHSS program seeks to replicate the wages and hours of a parent who is employed outside the home. A parent's employment is relevant only to the extent it relates to the parent's suitability or availability to provide IHSS services to a child. (MPP, § 30-763.451; Dept. All-County Letter No. 19-02 (January 9, 2019) (All-County Letter

---

[4]     This conclusion focuses on Reilly's general entitlement to benefits under the Section 8 voucher and IHSS programs, and does not consider any other basis for terminating these benefits such as the failure to comply with any program requirements.

19-02).) As section 12300, subdivision (e) explains, the predicate for a paid parent provider is that "no other suitable provider is available." (§ 12300, subd. (e); see MPP, § 30-763.451.) In providing the necessary in-home care to a disabled child, a parent forgoes any outside employment — not to displace otherwise competent professional caregivers — but to prevent a third party caregiver's "inappropriate placement or inadequate care" for their child. (§ 12300, subd. (e).)

For instance, in its 2019 All-County Letter 19-02, the Department clarified the paid parent provider requirements: "The paid parent IHSS provider requirements, set forth in MPP Section 30-763.451, do not require or imply that a parent must have marketable job skills or a work history to be their child's paid IHSS provider, *as long as it is the recipient child's needs which prevent the parent from maintaining or obtaining full-time employment*." (All-County Letter 19-02, *supra*, at p. 4, italics added.) Likewise, parents who retire or are laid off may also serve as their child's provider only if their retirement or layoff is due to the child's need for IHSS services. (*Id.* at p. 6.) In short, "if a parent is not employed full-time for a reason other than the recipient child's IHSS needs . . . that parent would not qualify as a paid parent IHSS provider." (*Id.* at p. 4.)

Second, even assuming Reilly's IHSS compensation represents her wages, this does not mean that providing in-home care to her child is "an employment for all purposes." (*Basden v. Wagner*, *supra*, 181 Cal.App.4th at p. 940.) In *Basden v. Wagner*, the Court of Appeal recognized certain duties — such as the state being responsible for the provider's unemployment compensation, workers' compensation, federal and state income tax and the like — that would suggest providing IHSS full-time could be considered an employment. The court, however,

pointed out that "the Legislature defined IHSS providers as employees for limited circumstances, but undisputedly not for all circumstances. More significantly, nothing in the statutes even remotely suggests the Legislature defined the provision of in-home, full-time, IHSS funded care by a parent to a child as full-time employment . . . ." (*Ibid.*, italics omitted.) The question here is whether a parent's compensation for providing in-home care is "specifically excluded" from the definition of annual income for purposes of the HUD regulation. (24 C.F.R. § 5.609(a)(3), (c)(16) (2020).) As explained above, we conclude that IHSS compensation to a parent provider is excluded from income. (See *ante*, at pp. 14–15.)

Nevertheless, the dissent maintains that "[u]nlike funds that reimburse a family's expenditures, funds provided by the state to compensate for the family's caregiving activities are available to meet the family's daily needs. *That is their purpose.*" (Dis. opn., *post*, at p. 25, italics added.) This characterization gravely misconstrues the nature and scope of IHSS services.

Under the IHSS program, the main focus is on assessing the disabled individual's "service needs and authorizing service hours to meet those needs." (§ 12301.2, subd. (a)(1).) A caregiver will be compensated only for those authorized service hours and nothing more. As previously explained (see *ante*, at p. 21), because many tasks are discrete and completed throughout the day, a provider might not be compensated for time spent waiting in between those tasks. Contrary to the dissent's suggestion, excluding a parent's IHSS compensation from income would not artificially reduce a family's income and thereby increase any resulting rent subsidy. At best, a parent's IHSS compensation will offset a portion of the costs of keeping

a developmentally disabled family member at home, and would not go far in meeting the family's daily needs.

The dissent's related assertion — i.e., family providers "are effectively selling their labor to the state, and the resulting income is indistinguishable, in its impact on the family's standard of living, from money earned working outside the home" (dis. opn., *post*, at p. 25) — is likewise long on conclusion but short on facts. (See *ibid.* ["to receive funds from IHSS a parent must accept their disabled child's care as, in effect, their *job*"].) In the case of Reilly's daughter, K.R., for example, she required protective supervision that is "only available" if "a need exists for twenty-four-hours-a-day of supervision in order for the recipient to remain at home safely." (MPP, § 30-757.173(a).) A person needing 24-hour supervision would require a provider's services for 720 hours in a 30-day month. However, an IHSS provider is limited to a statutory cap of 283 hours of compensation. (§§ 12303.4, 14132.95, subd. (g).) The discrepancy between a parent provider's actual hours of service and compensation belies any assertion that IHSS payments, at least with respect to protective supervision, are intended to represent wages the parent would have earned outside the home, where compensation would be based on every hour worked.

Finally, we find it significant that the IRS also treats in-home care payments — *whether the provider is related or unrelated to the disabled individual* — as excludable from a provider's income under Internal Revenue Code section 131. (26 U.S.C. § 131; see Rev. Proc. 2014-7, 2014-4 I.R.B. 445.) In 2014, the IRS explained that Medicaid waiver payments to states, which are used to fund IHSS payments through the state Medi-Cal program (see *ante*, at pp. 5–6 & fn. 2), should be *excluded*

from a provider's gross income. (Rev. Proc. 2014-7, 2014-4 I.R.B. 445.) It equated these payments to foster care payments, which are considered "difficulty of care" payments excludable from a provider's income under Internal Revenue Code section 131. (26 U.S.C. § 131(a) ["Gross income shall not include amounts received by a foster care provider . . . as qualified foster care payments"].) "The programs share the objective of enabling individuals who otherwise would be institutionalized to live in a family home setting rather than in an institution, and both difficulty of care payments and Medicaid waiver payments compensate for the additional care required." (Rev. Proc. 2014-7, 2014-4 I.R.B. 445 [these foster parents " 'are saving the taxpayers' money by preventing institutionalization of these children' "].) As relevant here, the IRS makes no distinction between care provided by a parent or by a third party — the exclusion for Medicaid waiver payments "*will apply whether the care provider is related or unrelated to the eligible individual.*" (*Ibid.*, italics added.)

Seeking to downplay any impact an IRS interpretation has on a HUD regulation, MHA notes that HUD has indicated that the "tax rules are different from the HUD program rules." (HUD, HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs (Nov. 2013) ¶ 5-1.) Be that as it may, we do not conclude that the IRS's interpretation is dispositive or compels the outcome in this case. We do, however, acknowledge that it provides persuasive insight, one that is consistent with the rulemaking record of the HUD regulation (24 C.F.R. § 5.609(c)(16) (2020)). (See *ante*, at pp. 11–13)

For example, though payments to foster parents and in-home care payments are both considered "difficulty of care"

payments excludable from a provider's taxable income, these payments would receive unequal treatment under MHA's interpretation of the regulation. Under 24 Code of Federal Regulations part 5.609(c)(2) (2020), "[p]ayments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are unable to live alone)" are excluded from income for purposes of Section 8 housing. If a family takes into their home an unrelated disabled adult who is unable to live alone, and receives payment from the State for providing care to that adult, such payments are excluded from the family's income. However, if that same family receives payment for providing the same care but to a developmentally disabled family member, those payments would not be excluded from income. To ascribe this interpretation to HUD, which would impose a financial penalty on a family simply because the care is given to a disabled family member rather than a disabled stranger, would not only be inconsistent with the IRS's treatment of both payments, there is no evidence in the regulation's rulemaking record that HUD intended different treatment.

### E. HUD's position

At our request, HUD filed an amicus brief in this matter. We first note that at oral argument HUD's counsel indicated that the agency did not request we give deference to its interpretation of the regulation because it believed the plain language controlled. (See *Kisor v. Wilkie* (2019) 588 U.S. ___ [139 S. Ct. 2400, 2415] ["If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means — and the court must give it effect"].) Urging us to affirm the Court of Appeal's judgment, HUD opines that the IHSS payments Reilly receives must be treated as

income under the regulation because that "compensation substitutes for income Reilly would otherwise earn for working outside the home." HUD essentially echoes the reasoning of the Court of Appeal below.

Though deference is generally accorded an agency's interpretation of its own regulation in the face of ambiguity (see *Auer v. Robbins* (1997) 519 U.S. 452; *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140), we conclude that such deference is not compelled here. (See *United States v. Mead Corp.* (2001) 533 U.S. 218, 228 ["[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances"].) Courts should defer to an agency's interpretation unless an " 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent *at the time of the regulation's promulgation.*' " (*Thomas Jefferson Univ. v. Shalala*, *supra*, 512 U.S. at p. 512, italics added.)

As explained above (see *ante*, at pp. 12–13), we conclude that HUD's clearly expressed intent at the time it added the exclusion for homecare payments (24 C.F.R. § 5.609(c)(16) (2020)) was to encourage families to provide in-home care to, and avoid institutionalization of, developmentally disabled family members. This contemporaneous intent is fully realized only when in-home payments for services needed to keep the developmentally disabled member at home — are excluded from income for purposes of the Section 8 program, i.e., whether those payments are ultimately made to a family member or to a third party provider. This interpretation is consistent with exclusion's language, which places no restrictions on *who* the provider of services can be. (24 C.F.R. § 5.609(c)(16) (2020).)

Contrary to MHA's suggestion, we do not perceive any intent by HUD to treat families with a developmentally disabled member and families with a medically disabled member the same, or to consider a parent's outside income the same as a parent's IHSS compensation. We will not pursue parity for parity's sake, especially if such pursuit runs counter to the language and purpose of the exclusion. Including a parent's in-home care payments as income to determine a family's Section 8 eligibility will have the perverse effect of making it *harder* for a family to maintain a home in which to care for the child.

In the end, we refuse to adopt a crabbed interpretation that does little to advance the tandem goals of offering affordable housing to low income families and of supporting families who themselves provide in-home care for developmentally disabled members. We cannot endorse a construction that yields a result antithetical to our nation's "goal of providing families of children with disabilities with the support they need to raise their children at home." (42 U.S.C. § 15091(c).) We conclude a parent's IHSS compensation to provide care to keep a developmentally disabled child at home is excluded from income under 24 Code of Federal Regulations part 5.609(c)(16) (2020).

## CONCLUSION

We reverse the Court of Appeal's judgment and remand the matter for further proceedings consistent with this opinion.

**CHIN, J.**

**We Concur:**

**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

REILLY v. MARIN HOUSING AUTHORITY

S249593

Dissenting Opinion by Chief Justice Cantil-Sakauye

The federal Housing Choice Voucher program, 42 U.S.C. section 1437f (hereafter Section 8), provides housing assistance to low-income families, with the amount of the assistance determined by the family's annual income. Under 24 Code of Federal Regulations part 5.609(c) (2020),[1] certain funds are excluded from the calculation of annual income. Among the funds excluded from that calculation are state payments to a family providing at-home care to a developmentally disabled family member *if* those payments "offset the cost of services and equipment needed to keep the developmentally disabled family member at home." (§ 5.609(c)(16).) The majority adopts an expansive interpretation of part 5.609(c)(16), holding that, in addition to excluding the state's reimbursement of out-of-pocket expenses, the regulation also covers the compensation paid to parents who are hired by the state to provide full-time care to their developmentally disabled children. Every other appellate court to consider part 5.609(c)(16) — the United

_____

[1] Hereafter part 5.609(c) — and, when referred to in a citation parenthetical, § 5.609(c). (See California Style Manual (2000) § 2:44.)

1

States Court of Appeals for the Fifth Circuit, the Minnesota Supreme Court, and our Court of Appeal — has adopted a narrower construction, limiting the exclusion to those state payments that reimburse a family's expenditures. In contrast, these courts have held that compensation to parents for their labor in caring for a developmentally disabled child, which constitutes genuine income to the family, is outside the scope of the exclusion.

The conclusion reached by these other appellate courts is the most straightforward reading of the relevant regulatory language, which is restricted to payments made "to offset the cost of services and equipment." (§ 5.609(c)(16).) And this interpretation fully serves my understanding of the purpose underlying the regulation, which is to ensure that families caring for a developmentally disabled family member are not disadvantaged in their receipt of Section 8 housing assistance by their acceptance of state help in keeping the family member at home. Significantly, the narrower interpretation is the one urged on us by the United States Department of Housing and Urban Development (HUD), the federal agency that drafted the regulation.

The majority's more expansive construction of the regulation relies on a strained reading that disregards the actual language, and it will have unfortunate and selective public policy consequences. First, the majority's ruling will introduce unintended and unwarranted inequities into the

administration of Section 8. Second, the majority's misreading will siphon scarce housing assistance from California's other low-income families, inevitably reducing the number of families who will benefit from the Section 8 program. In light of the misguided, if well-intentioned, nature of the majority's analysis, I respectfully dissent.

## I. BACKGROUND

### A. Plaintiff's Circumstances

Plaintiff Kerrie Reilly and her adult daughter, K.R., live together in a three-bedroom apartment in Marin County. Due to a severe developmental disability, K.R. requires around-the-clock supervision. Under the In-Home Supportive Services program (IHSS; Welf. & Inst. Code, § 12300 et seq.), the state pays plaintiff to provide full-time home care and supervision to her daughter. Without such care, K.R. would likely be placed in an institution. At the time of the trial court proceedings, the family's annual income exceeded $52,000, comprised of K.R.'s social security benefits of $11,000 and more than $41,000 in IHSS compensation to plaintiff.

Plaintiff is a long-time participant in Section 8. In 2004, plaintiff's second daughter, R.R., moved from the family's apartment to attend college. For the next five years, plaintiff falsely represented in annual, sworn certifications to the Marin Housing Authority (Authority), the agency responsible for administering her Section 8 benefits, that

R.R. continued to live with her.[2] After the Authority learned the truth, plaintiff admitted that she made the misrepresentations because she was concerned that she and K.R. would be required to move from their three-bedroom apartment if she disclosed R.R.'s move. Plaintiff's false representations also caused her to be granted, the Authority concluded, a larger Section 8 housing voucher than she would have received had the Authority known the true circumstances. When the Authority confronted plaintiff, she agreed to repay more than $16,000 in excess subsidies under a payment schedule. Unfortunately, plaintiff was often unable to make the scheduled payments. The Authority's patience ran out in 2015, when it terminated her participation in the Section 8 program.

As the Authority informed the trial court in explaining its decision to terminate plaintiff, its implementation of Section 8 is severely constrained by limited funding. In 2015, more than 5,000 families in Marin County eligible for Section 8 housing assistance were on a waiting list because the Authority was unable to help them. At the time, the Authority was authorized to grant vouchers to only 2,153 families; in practice, it provided rent vouchers only to 1,957

---

[2]     The majority's statement that plaintiff "did not inform" the Authority of R.R.'s departure (maj. opn., *ante*, at p. 2) is a charitable but misleading characterization of plaintiff's repeated and knowing falsehoods.

families due to insufficient funding.  The Authority decided to terminate plaintiff because, it explained, although it "has been grappling with the possibility of terminating hundreds of compliant families from the Section 8 Program, [plaintiff] has made it a practice to violate rules of the Section 8 Program and her contractual obligations."  Contrary to majority's claim (maj. opn., *ante*, at p. 2), the termination did not require plaintiff's eviction from her apartment, although she would become responsible for paying the entire rent.

In this mandate action challenging her termination, plaintiff argued that the Authority had improperly included her IHSS payments when calculating her annual income under Section 8, causing the Authority to understate the housing subsidy due her.  The trial court disagreed, sustaining the Authority's demurrer without leave to amend upon concluding that the IHSS payments were properly included in plaintiff's income calculation.  The Court of Appeal affirmed in a published decision. (*Reilly v. Marin Housing Authority* (2018) 23 Cal.App.5th 425, 439 (*Reilly*).) The Supreme Court now reverses the Court of Appeal.

**B.  Governing Law**

*1.  Section 8*

The Section 8 voucher program "is funded by HUD and administered by state and local public housing authorities . . . in accordance with regulations promulgated by HUD.

When a rent payment exceeds a specified percentage of a family's monthly income, the federal program pays the balance." (*Inclusive Communities Project, Inc. v. Lincoln Property Co.* (5th Cir. 2019) 920 F.3d 890, 900.) As HUD characterizes the program in an amicus curiae brief, "Section 8 is not an entitlement program; Congress appropriates only a fixed sum for vouchers . . . each year, and not every otherwise qualified family receives a voucher."[3] Each administering agency is assigned a maximum number of annual vouchers and has a fixed budget.[4] Yet Congress has underfunded the program in recent years, requiring

---

[3] If the Authority's experience is any guide, HUD's concession that "not every otherwise qualified family receives a voucher" is a gross understatement. More than 7,000 families in Marin County are eligible for assistance under Section 8, but fewer than 2,000 are actually provided vouchers.

[4] See Congressional Research Service, An Overview of the Section 8 Housing Programs: Housing Choice Vouchers and Project-Based Rental Assistance, No. RL32284 (Feb. 7, 2014). A copy of the report can be found at <https://www.everycrsreport.com/reports/RL32284.html#:~:text=The%20voucher%20program%20is%20funded,an%20annual%20budget%20from%20HUD.> (as of Aug. 28, 2020). All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

these agencies to operate at only 85 percent of their assigned budgets.[5]

Each subsidized family is required to contribute to its rent payment an amount equal to "thirty percent of the tenant family's monthly 'adjusted income' or ten percent of its monthly gross income, whichever is greater." (*Hayes v. Harvey* (3d Cir. 2018) 903 F.3d 32, 36, citing 42 U.S.C. § 1437f(*o*).) "Adjusted income" for this purpose is a family's "annual income," minus certain expenses and allowances. (24 C.F.R. § 5.611 (2020); *DeCambre v. Brookline Housing Authority* (1st Cir. 2016) 826 F.3d 1, 9 (*DeCambre*).) The calculation of annual income therefore determines the proportion of its monthly rent that a family participating in Section 8 must pay.

For purposes of Section 8, "annual income" constitutes "all amounts, monetary or not" that "[g]o to, or on behalf of, the family head or spouse . . . or to any other family member." (24 C.F.R. § 5.609(a)(1), (3) (2020); *DeCambre, supra*, 826 F.3d at p. 9.) Among other things, this includes "[t]he full amount, before any payroll deductions, of wages and salaries, . . . and other compensation for personal services." (24 C.F.R. § 5.609(b)(1) (2020).) Subpart (c) of part 5.609 lists

---

[5]     Eligibility Team, *How the Housing Choice (Section 8) Voucher Program is Funded* (Jan. 22, 2016) <https://eligibility.com/section-8/how-the-housing-choice-section-8-voucher-program-is-funded#> (as of Aug. 28, 2020).

16 exclusions from annual income. In addition to the exclusion on which plaintiff relies, part 5.609(c)(16), which excludes certain payments to a family providing at-home care to a developmentally disabled family member, these include payments received "for the care of foster children" (§ 5.609(c)(2)), payments "for, or in reimbursement of, the cost" of medical expenses (§ 5.609(c)(4)), students' financial aid (§ 5.609(c)(6)), certain nonrecurring payments (§ 5.609(c)(3), (9)), and student earnings and adoption assistance payments "in excess of $480" (§ 5.609(c)(11), (12)).

### 2. IHSS

The purpose of the IHSS program is "to avoid institutionalization of incapacitated persons. It provides supportive services to aged, blind, or disabled persons who cannot perform the services themselves and who cannot safely remain in their homes unless the services are provided to them. The program compensates persons who provide the services to a qualifying incapacitated person." (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 931 (*Basden*).) IHSS is administered by the state's counties (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2018) 24 Cal.App.5th 574, 578–579), which either hire a caregiver for the recipient or pay the recipient directly to cover the costs of a caregiver. (*Basden*, at p. 934; Welf. & Inst. Code, §§ 12302, 12304, subd. (a).) Counties are required to give preference to a care provider selected by the recipient, and some IHSS care

recipients are entitled to select and hire their own provider. (Welf. & Inst. Code, §§ 12303.4, subd. (b); 12304, subd. (a), 12304.1; *Skidgel*, *supra*, 24 Cal.App.5th at p. 579.)

The state may hire parents to care for their children under IHSS, but only "when the [parent] leaves full-time employment or is prevented from obtaining full-time employment because no other suitable provider is available." (Welf. & Inst. Code, § 12300, subd. (e); see generally, *Basden*, *supra,* 181 Cal.App.4th at pp. 939–940.) Of the 535,000 IHSS care providers in California, about 70 percent are a relative or spouse of the recipient, and about one-quarter of those are a parent. Slightly less than half of IHSS providers — 250,000 persons — are, like plaintiff, relatives of the person for whom they provide care and live in the same home.[6]

Plaintiff's claim that her IHSS payments should be excluded from the calculation of her Section 8 annual income is premised on part 5.609(c)(16), which excludes "[a]mounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the

---

[6] The State Department of Social Services reports a wide range of monthly data regarding participation in the IHSS program. The information cited in this paragraph is from a table of data for June 2020, maintained at IHSS Program Data <https://www.cdss.ca.gov/inforesources/ihss/program-data> (as of Aug. 28, 2020). The cited data is available under a tab labeled "Provider Details," which does not appear to be accessible through a separate URL.

developmentally disabled family member at home." The Authority and HUD interpret the phrase "[a]mounts paid . . . to offset the cost of services and equipment" to cover only payments by the state to compensate for a family's actual expenditures on services or equipment. (§ 5.609(c)(16.) Because plaintiff's IHSS compensation was not used to pay for the costs of services or equipment purchased by the family to care for K.R., the Authority explains, it did not exclude plaintiff's IHSS payments when calculating her annual income. Plaintiff contends, however, and the majority holds, that the phrase "[a]mounts paid . . . to offset the cost of services and equipment" (*ibid.*) should be construed to cover any payment made to a family by the state in connection with the in-home care of a developmentally disabled family member, regardless of whether the payment offset an expenditure by the family or compensated a family member hired by the state to care for the disabled person.

## II. DISCUSSION

### A. The Language of Part 5.609(c)(16) Precludes the Majority's Interpretation

We review questions of statutory interpretation de novo. (*Christensen v. Lightbourne* (2019) 7 Cal.5th 761, 771.) Under "our familiar principles of statutory construction," " '[w]e start with the statute's words, which are the most reliable indicator of legislative intent.' [Citation.] ' "We interpret relevant terms in light of their ordinary meaning,

while also taking account of any related provisions and the overall structure of the statutory scheme to determine what interpretation best advances the Legislature's underlying purpose." ' [Citations.] 'If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views.' " (*In re A.N.* (2020) 9 Cal.5th 343, 351–352 (*A.N.*).) We take the same approach when interpreting administrative regulations. (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1011.) Based on the ordinary meaning of its language, we should conclude that the part 5.609(c)(16) exclusion is limited to state payments that compensate a family's actual expenditures for services and equipment to keep a developmentally disabled family member in their home.

As noted above, part 5.609(c)(16), excludes from a Section 8 family's annual income "[a]mounts paid by a State agency to a family . . . to offset the cost of services and equipment needed to keep the developmentally disabled family member at home." According to Merriam-Webster, the verb "offset" means "to serve as a counterbalance for : COMPENSATE." (Merriam-Webster Dict. Online (2020) <https://www.merriam-webster.com/dictionary/offset> [as of Aug. 28, 2020]; see, e.g., *Steinmeyer v. Warner Cons. Corp.* (1974) 42 Cal.App.3d 515, 518 ["An 'offset' may be defined as

REILLY v. MARIN HOUSING AUTHORITY
Cantil-Sakauye, C. J., dissenting

a claim that serves to counterbalance or to compensate for another claim"].) Part 5.609(c)(16) therefore excludes payments by the state to a family that are made to "counterbalance" the cost of services and equipment needed to keep the developmentally disabled family member at home. Necessarily, this language anticipates that an equivalent cost has been or will be paid by the family for those services or equipment, since there would be nothing to counterbalance in the absence of such an expenditure.

If HUD, the agency that drafted part 5.609(c)(16), had intended the regulation to bear the broader meaning imposed by the majority, it could have used a more inclusive phrase, such as amounts paid by the state "*for* services and equipment," instead of requiring the excluded payments to "offset the cost" of services and equipment. This is the approach taken by HUD in drafting the only part 5.609(c) exclusion that undoubtedly bears the breadth bestowed on subpart (c)(16) by the majority. Part 5.609(c)(2) excludes "[p]ayments received *for the care* of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are unable to live alone)," leaving no uncertainty about its meaning.[7] (Italics added.) By imposing

_____

[7] The parenthetical presumably explains the reason for the breadth of the exclusion: To provide a benefit to low-income families that care for unrelated persons who are in

a similar breadth on part 5.609(c)(16), the majority's reading renders pointless the use of the term "offset" because its reading is not restricted to the exclusion of payments that "offset the cost" of services and equipment. It is an elementary principle of statutory interpretation that " '[a]n interpretation that renders statutory language a nullity is obviously to be avoided.' " (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039.) The majority's expansive approach also defies the general interpretive principle that exceptions to a statute are to be construed narrowly. (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 771; *Simpson Strong-Tie Co. v. Gore* (2010) 49 Cal.4th 12, 22.)

HUD has confirmed this understanding in an amicus curiae brief, arguing that it intended the regulation to reach only state payments that reimburse a family's expenditures. As HUD reasons, this narrower reading "accords with the

---

distressed circumstances. The majority contends that interpreting subpart (c)(2) differently from subpart (c)(16) "would be unreasonable" because both families are providing "the same care." (Maj. opn., *ante*, at p. 28.) The different approaches, however, are readily explained. HUD could reasonably have concluded that the familial connection required by part 5.609(c)(16) makes it unnecessary to bestow this type of benefit on families covered by that exclusion. In any event, the distinctly different language in the two exclusions suggests that they should be interpreted differently.

basic policy objectives of the regulation. [Citation.] As HUD
has explained, in promulgating [part] 5.609(c)(16), the
exclusion exists because 'families that strive to avoid
institutionalization should be encouraged, and not punished.'
[Citation.] The regulation pursues this goal in part by
ensuring that families that choose different means of keeping
the developmentally disabled family member at home are
treated evenhandedly."[8]

Plaintiff argues that the term "cost" could cover more
than a monetary expenditure. In ordinary parlance, "cost,"
admittedly, can refer not simply to the price paid for
something, but more broadly to "the outlay or expenditure
(as of effort or sacrifice) made to achieve an object" or the
"loss or penalty incurred especially in gaining something."
(Merriam-Webster Dict. Online (2020)
<https://www.merriam-webster.com/dictionary/cost> [as of
Aug. 28, 2020].) In this connection, plaintiff invokes the
economic concept of an "opportunity cost," that is, the
opportunities foregone when a person makes a particular

---

[8] Leaving aside debate about the precise degree of
deference to be accorded HUD's interpretation under
*Yamaha Corp. of America v. State Bd. of Equalization* (1998)
19 Cal.4th 1, 7–8, the administrative agency's interpretation
undoubtedly deserves serious consideration. Although the
majority does address HUD's views, its explanation for
rejecting them amounts to little more than a disagreement
with HUD over which interpretation best serves HUD's
goals. (Maj. opn., *ante*, at pp. 28–30.)

economic choice.  Here, the argument goes, "cost" refers to the employment opportunities that plaintiff has foregone in order to provide care under IHSS.  The payments therefore "offset" the cost to plaintiff of not having other employment.  This is hardly the "ordinary meaning" of the language HUD chose to use.  (*A.N.*, *supra*, 9 Cal.5th at p. 351.)  We typically refer to a payment for services as "compensation" or, more simply, "payment" for the work performed.  We do not refer to compensation for providing a service as "offsetting the cost" of the service provider's own effort, much less the service provider's decision to take this job, rather than a different hypothetical job.

The majority takes a different tack in justifying its interpretation, suggesting that because much of the IHSS compensation paid to plaintiff will ultimately be spent on costs associated with supporting K.R. in the family home, that compensation is paid to "offset the cost of services and equipment needed to keep [K.R.] at home."  (§ 5.609(c)(16); see Maj. opn., *ante*, at p. 10 ["Whether a family uses homecare payments to support itself so that it may care for a developmentally disabled member at home, or instead uses the funds to pay a third party to provide care for some of the time, these payments do no more than 'offset' the 'cost' of services and equipment needed to avoid institutionalization"].)  This rationale fails for two independent reasons.  First, while it finds a role for the term

15

"offset," it disregards other aspects of the regulatory language. Part 5.609(c)(16) excludes only state payments that offset expenditures for "services and equipment." As rationalized above, the majority's reading necessarily stretches the exclusion to cover *any* cost related to K.R.'s presence in the home, including food, clothing, and rent. These are not normally viewed as "services and equipment."[9] By restricting the exclusion to the costs of "services and equipment," HUD signaled its intent to exclude only costs related to the family member's disability, rather than the ordinary, if necessary, expenses of daily life. Second, the regulation excludes "[a]mounts paid by a state agency . . . to offset the costs of services and equipment." (§ 5.609(c)(16).) As discussed above, the IHSS compensation is paid by the state to compensate plaintiff for her labor in caring for her daughter. While it may be *used* by plaintiff to cover the costs of supporting her daughter, it is not paid by the state to offset those costs.

The restrictive view of part 5.609(c)(16) has been adopted by all other appellate courts that have considered the issue. The plaintiff in *Anthony v. Poteet Housing Authority*

---

[9] Indeed, because the majority reads the regulation to exclude the entirety of plaintiff's IHSS compensation on this basis, it construes "the costs of services and equipment" to cover the cost of anything plaintiff chooses to spend her compensation on.

(5th Cir. 2009) 306 Fed. Appx. 98, the first decision to address this issue, lived with her developmentally disabled adult child. Under a state-funded program in Texas, she was employed by a private entity to care for the child and, like plaintiff, contended that the income she earned in this role should be excluded from her Section 8 income under part 5.609(c)(16). The court was willing to accept that her payments, despite being provided by a private employer, constituted payments by the state. It rejected her argument that the payments should be excluded from the calculation of her Section 8 income under part 5.609(c)(16), however, upon concluding that the exclusion applies only to reimbursements for costs paid for care by third-party providers. As the court explained, "One must incur costs before they can be offset." (*Anthony*, at p. 101.)

The Court of Appeal below reached a similar conclusion after a more extensive analysis. It declined to equate "offset" with "reimburse," but the distinction it found between the two terms was quite narrow and is inconsequential in these circumstances. As the court explained, part 5.609(c)(16) "appears to reach money paid to a family so that the family can go out and hire services or purchase equipment necessary for the developmentally disabled family member. Such payments 'offset the cost of services and equipment' that would otherwise fall on the family. But they are not reimbursement for out-of-pocket expenses if the family

receives payment before, rather than after, incurring the expense."[10]  (*Reilly, supra,* 23 Cal.App.4th at p. 434.)  The appellate court below also rejected plaintiff's argument that the IHSS payments should be excluded because "the services she provides are necessary for her daughter to live at home, and the IHSS payments offset the costs of those services." (*Id.* at p. 432.)    The court rightly accepted plaintiff's contention that her services were necessary to keep K.R. at home, but it found the language of the regulation inconsistent with plaintiff's argument that it excludes any payment for necessary services.  As the court explained, part 5.609(c)(16) refers to payments " 'to a family . . . to offset the cost of services . . . .' " (*Reilly*, at p. 434.)  "If a payment is to 'offset the cost of services,' the payment must go to the same entity that incurs the cost of those services.  Otherwise the payment does not counterbalance or compensate for the cost of services. . . . This means that the costs these payments offset must be costs that the family itself incurs."  (*Ibid.*)

Most recently, the Minnesota Supreme Court reached the same conclusion in *In re Ali* (Minn. 2020) 938 N.W.2d 835 (*Ali*).  In that case the plaintiff lived at home with her developmentally disabled son.  Under a Minnesota state

---

**10**    The majority contends that " 'offset' as used here does not necessarily reflect th[e] same meaning" as "reimburse" (maj. opn., *ante*, at p. 10), but it does not clearly articulate what the difference might be.

program, she was provided with a budget for the services and equipment needed to keep him in the home, some of which she allocated to herself as compensation for her services as a caregiver. (*Id.* at p. 837.) In concluding that the sums allocated to plaintiff were not excluded from her Section 8 income under part 5.609(c)(16), the court held that the word "cost" should be interpreted as "price." (*Ali*, at p. 839.) It rejected the argument that the word should be given a broader definition for three independent reasons. First, referring to the entirety of the phrase "to offset the cost of services and equipment," the court reasoned that "[t]he 'and' between the words services and equipment suggests that the same measurement is used for each. Typically, the cost of equipment is calculated in monetary terms — such as the cost to buy or lease." (*Ibid.*) Second, like the appellate court below, *Ali* cited the use of the word "cost" elsewhere in part 5.609, where it clearly refers to "a monetary expense." (*Ali*, at p. 839.) Finally, the court noted that "when the regulators wanted to exclude amounts paid to family members for their own services, they knew how to do so — and did so unambiguously." (*Ibid.*) *Ali* cited in support two other subparts of part 5.609(c), in both of which the regulatory language, unlike part 5.609(c)(16), unambiguously excludes

state payments made to the Section 8 family.[11]  (*Ali*, at p. 839.)

### B. Extrinsic Aids to Interpretation Weigh Against the Majority's Approach

I do not agree with the majority that the interpretation it has imposed on the language of part 5.609(c)(16) is sufficiently reasonable to create a statutory ambiguity, but there is no need to debate the issue.  The available extrinsic aids to interpretation also weigh against the majority's reading.  Its interpretation assigns an unfounded purpose to the part 5.609(c)(16) exclusion that will seriously distort the intended operation of the annual income calculation for families receiving caregiving income under IHSS.  In turn, this distortion will not only introduce unintended inequities among Section 8 families, but it is also likely to materially reduce the funds available to support housing subsidies for other low-income families in California.  These unfortunate consequences weigh strongly against the majority's ruling.

#### 1. *The rulemaking history does not support the majority's reading*

The majority finds support for its interpretation in commentary on part 5.609(c)(16) published by HUD around

---

[11]  In addition to addressing part 5.609(c)(2), discussed above, which excludes payments to foster families, *Ali* cited part 5.609(c)(12), which excludes from annual income "[a]doption assistance payments in excess of $480 per adopted child." (*Ali*, *supra*, 938 N.W.2d at p. 839.)

the time of its adoption. (Maj. opn., *ante*, at pp. 11–16.) Reviewing the same materials, the Court of Appeal found them "unhelpful in resolving the interpretive issue before us," and I agree. (*Reilly*, *supra*, 23 Cal.App.5th at p. 436.) As quoted by the majority (maj. opn., *ante*, at p. 12), the commentary never expressly addresses the issue before us — the distinction between state payments made to reimburse a family's expenditures for services and those made to compensate the family's own provision of services — and does little more than parrot the language of the regulation. The commentary does use the term "homecare payments," but it characterizes those payments in the language of the exclusion itself. That is, "homecare payments," as the term is used by HUD, are payments made "to offset the cost of services and equipment needed to keep a developmentally disabled family member at home, rather than placing the family member in an institution." (60 Fed.Reg. 17388, 17389 (Apr. 5, 1995).) HUD's use of the term is therefore of no help in resolving the question before us.

The majority's contrary conclusion is based on circular reasoning. Beginning with its assumption that "homecare payments" means any payment made by the state in connection with the care in the home of a developmentally disabled person, the majority concludes that by joining that term with the regulatory language HUD signaled its agreement with the majority's broad interpretation. The

conclusion that "homecare payments" refers to any payment by the state, however, rather than only those intended to offset family expenditures, is unsupported by anything in the commentary.  In fact, the commentary clearly uses "homecare payments" merely as a synonym for the type of payments that are excluded by part 5.609(c)(16).  Its use therefore confirms the majority's interpretation only if one assumes that the regulation should be interpreted in the manner adopted by the majority.  In reality, the HUD commentary simply does not address the question before us.

The policy argument advanced by the majority in connection with HUD's commentary is, in essence, that because payments made by the state to compensate a family for caregiving services may be critical in keeping a developmentally disabled family member in the home, they must be included within the part 5.609(c)(16) exclusion.  The flaw in this logic, as the Court of Appeal noted in rejecting the same argument below (*Reilly, supra,* 23 Cal.App.4th at p. 434), is that it ignores the language of the regulation.  Merely because these payments are important in keeping a developmentally disabled family member in the home does not alone mean that they "offset the costs of service and equipment" necessary to that task.  As explained above, to reach the majority's conclusion it is necessary to read the phrase "offset the costs" as synonymous with "for," a different and broader term.  Because it is the regulation's language

that must guide our interpretation, we are required to respect HUD's word choice.

> ### 2. *The majority's interpretation misunderstands the limited function of the part 5.609(c)(16) exclusion*

The impetus underlying the majority's interpretation of part 5.609(c)(16) seems to be to maximize the Section 8 subsidy for persons in plaintiff's situation, given the difficulties of their circumstances. In other words, if some subsidy is good, more is better. Because the purpose of the exclusion is to help burdened, low income families, it is difficult to argue with the sentiment. Yet our interpretation must be guided not by our own view of proper public policy, but by the views of Congress and HUD, the agency tasked with administering the Section 8 program. In implementing the congressional plan, HUD is required to balance a wide variety of pertinent policy and equity considerations, not the least of which is the allocation of very limited public resources among many needy families. Its policy choice is reflected in the language of part 5.609(c)(16), which limits the exclusion to out-of-pocket expenses. As discussed below, HUD's choice is consistent with the foundational concerns of Section 8. The majority's more expansive view upsets the balance struck by Section 8, will create unintended inequities in its implementation, and will ultimately lead to a

diminution in the housing assistance available to other low-income Californians.

The purpose of the part 5.609(c)(16) exclusion is to ensure that the acceptance of state financial help by families who keep a developmentally disabled family member at home does not place the families at a disadvantage in receiving Section 8 housing assistance; they are to be " 'encouraged, and not punished.' " (Maj. opn., *ante*, at p. 12 [quoting HUD explanation].) To accomplish this, part 5.609(c)(16) excludes from the families' annual income funds provided by the state that the family spends on services and equipment to support at-home care of the disabled family member. By excluding this type of payment, the regulation ensures that the acceptance of state aid by families maintaining a developmentally disabled family member does not inflate their annual income and result in a diminished Section 8 subsidy. Instead, the family receives the same housing subsidy as other Section 8 families having a similar disposable income.

There is no indication in the language of the regulation itself or the limited regulatory history that, in adopting part 5.609(c)(16), HUD intended to go further and provide affirmative *advantages* to families with a developmentally disabled member at home. HUD did not say such families should be *preferentially benefitted*, and not punished. Yet such a preferential benefit is the consequence of the

majority's interpretation of part 5.609(c)(16), since it affords families who are paid to provide at-home care of a developmentally disabled family member substantially greater Section 8 housing subsidies than to other low-income families with the same family income.

Section 8 housing subsidies are determined by a participating family's income — that is, the funds available to the family to pay for rent and other daily needs.[12] The part 5.609(c)(16) exclusion is necessary because the regulations defining "annual income" for purposes of Section 8 are very broad, including "all amounts, monetary or not" that "[g]o to, or on behalf of, the family head or spouse . . . or to any other family member." (24 C.F.R. § 5.609(a)(1) (2020).) Given this comprehensive definition, any payments made by the state to a family for the care of a developmentally disabled family member are included in annual income under part 5.609(a), even if the payments are not available to the family to pay for rent and other daily needs because they merely offset family expenditures for at-home care. Properly understood, part 5.609(c)(16) prevents a family's annual income from being inflated by payments covering such out-of-

---

[12] Literally, it is not the subsidy that is determined by a family's income. Rather, annual income determines the amount the family is required to contribute to its rent payment. The subsidy is then the difference between this contribution and the family's actual rent. For purposes of this analysis, the difference is immaterial.

pocket expenses, recognizing that those payments should not be treated as income because they do not increase the resources available to the family for daily expenses. In the absence of the exclusion, the acceptance of such aid would reduce the family's Section 8 subsidy without improving its standard of living — in the words of HUD, such families would be "punished."

This highlights the fundamental difference, for purposes of Section 8, between IHSS funds that are given to reimburse expenditures by a family and funds that compensate a family for the care of the disabled family member. Unlike funds that reimburse a family's expenditures, funds provided by the state to compensate for the family's caregiving activities *are* available to meet the family's daily needs. That is their purpose. In accepting compensation for their caregiving activities, IHSS participants are effectively selling their labor to the state, and the resulting income is indistinguishable, in its impact on the family's standard of living, from money earned working outside the home. For that reason, HUD has determined that this compensation is properly characterized as income under Section 8.

This is particularly true of parents who are hired to provide caregiving responsibilities under IHSS. As noted above, the state precludes a parent's acceptance of full-time work outside the home if the parent is receiving IHSS

compensation; such funding is available to parents only if "the [parent] leaves full-time employment or is prevented from obtaining full-time employment because no other suitable provider is available." (Welf. & Inst. Code, § 12300, subd. (e).) In other words, to receive funds from IHSS a parent must accept their disabled child's care as, in effect, their *job*. Plaintiff is an example. So far as the appellate record reveals, caring for her daughter is her full-time activity, and IHSS compensation is her only income.

The majority argues that the acceptance of compensation from IHSS is not " 'an employment for all purposes.' " (Maj. opn., *ante*, at p. 24.) The issue here, however, is not whether IHSS "employs" caregivers for all purposes. As defined by part 5.609, "annual income" includes any "compensation for personal services," not just income from formal employment. (24 C.F.R. § 5.609(b)(1) (2020).) The issue is therefore whether the compensation received from IHSS by persons like plaintiff should be treated the same as income received by Section 8 participants from other types of compensable labor. By limiting the exclusion of part 5.609(c)(16) to offsetting payments, HUD has declared that it should. The majority may disagree with HUD's policy

choice, but it is HUD's choice, not that of the majority, that must govern our interpretation.[13]

Excluding IHSS compensation from a Section 8 family's annual income, as the majority requires, artificially reduces the family's income and, consequently, increases the family's housing subsidy above the level justified by its actual income. The effect can be substantial. Take, as an example, plaintiff. As noted above, a Section 8 family is ordinarily required to contribute 30 percent of its annual income toward rent. The remainder of its rent is paid by the program. Plaintiff's family income in the latest year for which we have information was more than $52,000, consisting primarily of plaintiff's $41,000 income from IHSS; the remainder was $11,000 in disability payments to K.R. If plaintiff's IHSS compensation is included in her annual income for purposes of Section 8, the family would be expected to contribute $1,300 toward its monthly rent. Here, the majority would exclude plaintiff's $41,000 in IHSS compensation from the

---

[13] The majority also finds support in the exclusion of in-home care payments from "income" under the Internal Revenue Code. (Maj. opn., *ante*, at pp. 26–27.) Because Section 8 and the Internal Revenue Code are quite different statutes with very different aims, there is no reason why the exclusion of IHSS payments from federal taxable income should weigh in favor of their exclusion from "annual income" under Section 8.

family's annual income. Plaintiff's family will therefore be treated as though it had an annual income of $11,000, although it was living on an actual income of $52,000 per year. As a result, the family's expected rent contribution will be reduced to $275.[14] The remaining $1,005 of the family's monthly rent payment, an annual gap of more than $12,000, must be made up from the Authority's Section 8 funds. It is noteworthy that the majority nowhere acknowledges, let alone attempts to explain or justify, that its interpretation will treat a family with an annual income exceeding $52,000, more than three times the federal poverty level for a family of two, as though it were living far below the poverty line.[15] Yet that is the clear and unavoidable import of its decision.

Low-income families caring for a developmentally disabled family member at home face daily challenges

---

[14] This assumes the resulting subsidy does not exceed the maximum permitted. Section 8 housing subsidies are capped by a "payment standard," which is determined by local rental conditions. (See *Nozzi v. Housing Authority* (9th Cir. 2015) 806 F.3d 1178, 1184–1185; 24 C.F.R. § 982.503(b) (2020); 42 U.S.C. § 1437f(*o*)(2).) The appellate record does not contain sufficient information from which we may determine whether plaintiff's subsidy, as re-jiggered by the majority, would be capped.

[15] The 2020 federal poverty level for a family of two is an annual income of $17,240. (See U.S. Dept. Health & Human Services, Poverty Guidelines (Jan. 2020) <https://aspe.hhs.gov/poverty-guidelines> [as of Aug. 28, 2020].)

unknown to the rest of us.  Few would begrudge such families a generous housing subsidy, above and beyond that provided to other low-income families with a similar income — *if* there was evidence that Congress or HUD intended to provide them such assistance.  But as noted above, the part 5.609(c)(16) exclusion was intended to ensure that families receiving aid from IHSS are simply treated the same as, not better than, other families — to ensure that they were not punished, rather than to preferentially benefit them.

> 3. *The majority's interpretation will introduce unintended inequities into Section 8 implementation and reduce the availability of Section 8 housing assistance in California*

As discussed above, the majority's reading of the part 5.609(c)(16) exclusion is contrary to its language and achieves the result, unintended by HUD, of granting IHSS participants like plaintiff substantially greater Section 8 subsidies than are justified by their actual income.  That alone, of course, would be sufficient to reject the reading.  But we should be particularly wary of imposing a rule HUD did not write, given the serious public policy consequences that will follow.

As explained below, these consequences are of two types.  First, the interpretation adopted by the majority will create inequities among families participating in the IHSS and Section 8 programs.  Families that are paid through IHSS to care at home for a developmentally disabled person

will receive a far larger housing subsidy than families of similar income that (1) IHSS funds to hire a third party to care for a developmentally disabled family member in their home or (2) receive IHSS funds to care for a *medically* disabled family member.

Second, and just as important, the majority's interpretation will reduce, by an unknown but potentially sizable amount, the number of families that can obtain Section 8 housing assistance in California. The majority's decision will not increase by a single dollar the Section 8 funds reaching California. Yet it will require the state's counties to steer a significantly larger portion of their Section 8 housing funds to families that receive IHSS compensation for caring for a disabled member in the home. These increased subsidies can come from only one place: The funds available to other low-income families who are, or would have been, receiving housing assistance under Section 8. The majority's expansive interpretation will come at the cost of assistance to other families in need.

First the inequities. IHSS provides families with the funds necessary to maintain a developmentally disabled family member in their home. The Authority or the family can use these funds to hire a third-party caregiver or, alternatively, a member of the family for the same role. Both approaches serve the purposes of IHSS and the part 5.609(c)(16) exclusion by (1) keeping the

developmentally disabled family member out of an institution and (2) ensuring that the family is not disadvantaged in the receipt of Section 8 funds by doing so. So far as appears, neither HUD nor IHSS favors one option over the other; certainly there is no language in either Section 8 or IHSS reflecting a preference, as the majority acknowledges. (Maj. opn., *ante*, at p. 21 ["despite no expressed preference for family providers per se"].) Yet under the majority's reading a family that provides its own compensated care will receive a far larger Section 8 housing voucher than the family that uses IHSS funds to hire a nonfamily member to provide the same care, even if both families have identical incomes. This occurs because, under the majority's interpretation, some or all of the income of the first family, consisting of compensation received from IHSS, is excluded from the annual income, while the income of the second family, earned outside the home, is fully included. Assuming both families end up with similar disposable income, the first family will receive a far larger subsidy under Section 8 due to the exclusion of a significant portion of its disposable income. (See *Reilly*, *supra*, 23 Cal.App.5th at pp. 437–438.) There is no indication in the language of part 5.609(c)(16) or the regulatory history to suggest that HUD intended this result; in its amicus curiae brief, HUD expressly disavows such an intent.

The majority seeks to explain away this disparity by claiming that persons needing 24-hour care " 'are more likely to receive better continuous care from relatives living with them whose care is more than contractual.' " (Maj. opn., *ante*, at pp. 21, quoting *Miller v. Woods* (1983) 148 Cal.App.3d 862, 870.) Neither *Miller* nor our appellate record contains evidence to support the proposition that third-party caregivers provide substandard care, compared to family members.[16] But more to the point, the majority cites no evidence that HUD believed this to be true or that it crafted part 5.609(c)(16) based on any assumptions about the relative competence of family members versus third-party caregivers.

Much of the majority's policy justification for its interpretation is a recognition of the importance and difficulty of the work done by persons who care for a developmentally disabled family member at home. And I agree, there is no doubt that this work is difficult and important. If preferentially benefitting families who care for developmentally disabled members themselves, rather than

---

[16] The majority notes that IHSS does not pay for 24-hour care. (Maj. opn., *ante*, at p. 26.) Although true, that is of no policy consequence here. Families that hire a third-party to provide care for a developmentally disabled family member in their home must provide the same type of uncompensated off-hours care for the dependent as families that receive IHSS compensation.

retain a third-party caregiver, were actually a motive underlying part 5.609(c)(16), however, one would expect some express indication that HUD intended to favor family care over care by third-party providers. As noted above, there is no such indication. In fact, the regulation is entirely silent, and therefore presumably neutral, on that issue.[17]

The majority's interpretation will create a similar inequity between families that receive IHSS compensation to care for a developmentally disabled family member and families that receive IHSS funds to care for a *medically* disabled family member. (See *Reilly*, *supra*, 23 Cal.App.5th at p. 438.) Like families maintaining a developmentally disabled member in the home, families that maintain a medically disabled family member in the home can receive IHSS reimbursement for expenditures necessary to keep that person at home as well as compensation for caregiving by a family member. The Section 8 exclusion covering families with a medically disabled member, however, allows the

---

[17] The majority also claims that if IHSS compensation is not excludable under part 5.609(c)(16), the two programs, IHSS and Section 8, will be at "cross-purposes," presumably because accepting IHSS compensation will reduce a family's Section 8 subsidy. (Maj. opn., *ante*, at p. 23.) Accepting IHSS compensation, however, is no more at cross-purposes with Section 8 than is employment generally, since all income reduces a family's Section 8 subsidy to the same degree. In any event, there are no cross-purposes. The supplement to a family's income from accepting IHSS compensation far exceeds any corresponding decline in its Section 8 subsidy.

exclusion from annual income only of "[a]mounts . . . that are specifically for, or in reimbursement of, the cost of medical expenses . . . ." (§ 5.609(c)(4).)  Although families caring for a medically disabled family member face challenges similar to those of families caring for a developmentally disabled family member, the enhanced Section 8 subsidy made available by the majority's interpretation of part 5.609(c)(16) is unavailable to families with a medically disabled member. Such families will also receive a materially reduced Section 8 subsidy compared to families that benefit from the majority's interpretation of part 5.609(c)(16).

The majority responds that this disparity "is inherent in the federal regulation itself" because part 5.609(c)(4) permits recovery only of payments to third-party providers. (Maj. opn., *ante*, at p. 19.)  The argument misses the point. Part 5.609(c)(16) has a materially wider scope than part 5.609(c)(4) only because the majority has interpreted it that way.  If "offset the cost of services and equipment" is interpreted to cover only the reimbursement of out-of-pocket expenditures, the two exclusions have a similar scope.  It is not "the federal regulation itself," but the majority's interpretation of it, that creates an inequity.  The majority otherwise fails to explain what possible public policy supports giving families with a developmentally disabled member far

more advantageous treatment under Section 8 than families with a medically disabled family member.[18]

The second unfortunate policy consequence of the majority's interpretation of part 5.609(c)(16) is its inevitable diminution of the funds available to other low-income participants in the Section 8 program. In an ideal world, the majority's award of greater Section 8 housing subsidies to low-income families receiving state compensation to care for disabled family members at home would be financed by additional congressional appropriations for the Section 8 program. In our real world, it does not work that way. Already, Section 8 housing subsidies are available only to a relatively small subset of all eligible families. The Authority, for example, is authorized to serve less than one-third of the families that qualify for its help. Yet even that does not fully capture the inadequacy of the program. Presumably because

_____

[18]    The majority's claim that HUD believes that families with a developmentally disabled member would "receive unfair treatment" if they were not allowed to exclude income (maj. opn., *ante*, at p. 20) is based entirely on HUD's comment that such families should be " 'encouraged, and not punished' " (*ibid.*, italics omitted). Because no other class of Section 8 participants, besides foster parents, is able to exclude such income, restricting the exclusion to reimbursement of expenditures hardly constitutes punishment. The majority argues that such families will be punished if their income is not excluded because they might not qualify for Section 8 subsidy. (*Ibid.*) Again, the same is true of all other families who have too much income to qualify for Section 8; it is not a punishment.

of congressional underfunding, the Authority actually provides vouchers to only 1,957 families, rather than the 2,153 it is authorized to help.

The majority's generosity toward plaintiff and similar IHSS participants does not come without cost, and that cost will likely be borne by other low-income families in California. The funding available to the Authority will not be increased by $12,000 per year merely because the majority has decreed that plaintiff must receive an additional annual subsidy of $12,000. Instead, given the fixed and inadequate budgets available under Section 8, it is likely that every additional dollar of subsidy provided to families with a developmentally disabled member at home will come directly from the funds available to subsidize the housing of other low-income families that are, or could have been, served by the Authority. By skewing the allocation of Section 8 housing subsidies to families receiving IHSS compensation, contrary to HUD's express intent, the majority's misinterpretation of the regulation will likely lead to a reduction in the housing subsidies available to other low-income families in California, and these will likely be reduced in an amount equal to the

enhanced subsidies given by the majority to IHSS participants.[19]

If the language of part 5.609(c)(16) required this result, we would be duty-bound to implement it. In fact, the result is eminently avoidable. To bring it about, the majority stretches the language of the regulation and fails to account for the serious public policy implications weighing against its decision. Further, the dubious end result is to require the Authority to treat a family with an income of more than $50,000 as though it were living on $11,000. In the process, the majority will divert the Authority's all-too-scarce low-income housing assistance away from other needy families. Every other court to consider the issue has avoided this result, and this court should as well.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**
**CORRIGAN, J.**
**KRUGER, J.**

---

[19] We lack the evidence necessary to estimate the financial impact of the majority's interpretation, but the limited information available suggests that it could be substantial. According to the state data cited above (see *ante*, fn. 6), there are currently 250,000 "live-in relative providers" caring for a disabled family member under IHSS. If just a tiny proportion of those live-in relatives care for a developmentally disabled person, participate in the Section 8 program, and receive IHSS compensation similar to that of plaintiff, the majority's ruling will divert millions of dollars in Section 8 housing subsidies from other low income families state-wide.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Reilly v. Marin Housing Authority

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 23 Cal.App.5th 425
**Rehearing Granted**

_____

**Opinion No.** S249593
**Date Filed:**  August 31, 2020

_____

**Court:**  Superior
**County:**  Marin
**Judge:**  Paul M. Haakenson

_____

**Counsel:**

Law Offices of Frank S. Moore, Frank S. Moore; Autumn M. Elliott, Ben Conway and Deborah Gettleman for Plaintiff and Appellant.

Morgan, Lewis & Bockius, Thomas M. Peterson and Jordan Mundell for Association of Regional Center Agencies, Autism Society of Los Angeles, CASHPCR, Disability Voices United, Fairview Families and Friends, Inc., Housing Choices, Jewish Los Angeles Special Needs Trust (JLA Trust), National Disability Rights Network, Professor Alison Morantz and Public Counsel as Amici Curiae on behalf of Plaintiff and Appellant.

Munger, Tolles & Olson and Michael E. Soloff for National Housing Law Project and Western Center on Law and Poverty as Amici Curiae on behalf of Plaintiff and Appellant.

Ilya Filmus; WFBM, Randall J. Lee, Anne C. Gritzer; Wilson Elser Moskowitz Edelman & Dicker and Robert Cooper for Defendant and Respondent.

Paul Compton, Miniard Culpepper, David M. Reizes, Alexandra N. Iorio, Joseph H. Hunt, Alisa B. Klein, Melissa N. Patterson and Brad Hinshelwood for United States as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Autumn M. Elliott
Disability Rights California
350 S. Bixel Street, Ste. 290
Los Angeles, CA 90017
(213) 213-8000

Robert Cooper
Wilson Elser Moskowitz Edelman & Dicker LLP
555 S. Flower Street, Suite 2900
Los Angeles, CA 90071
(213) 443-5100

Brad Hinshelwood
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-7823